ALLENDALE LEASING, INC., Louise E. LeBlanc, Darlington Braves, Inc., Reali Bus Service, Inc., Northern Athletic Club

v.

Walter STONE, Individually and in his capacity as Director of the Rhode Island State Police; Division of State Police, and Dennis J. Roberts II, Individually, and in his capacity as Attorney General.

Civ. A. No. 83–518P.

United States District Court,
D. Rhode Island.

Aug. 5, 1985.

Robert Mann, Providence, R.I., for plaintiffs.

Thomas Caruolo, Asst. Atty. Gen. of the State of R.I., Providence, R.I., for defendant.

## OPINION AND ORDER

PETTINE, Senior District Judge.

This case is before the court on cross motions for summary judgment. The plaintiffs instituted their suit pursuant to 28 U.S.C. § 1331 and § 1343 and 42 U.S.C. § 1983, alleging that Rhode Island General Laws § 11–19–30 *et seq.* and certain implementing regulations violate rights secured to them by the First and Fourteenth Amendments to the United States Constitution. They also assert several pendent claims grounded in state law. The challenged provisions regulate the licensing and operation of the game Bingo or Beano and vest the state police with the power to promulgate such regulations as may be necessary to implement the statutory objectives. The plaintiffs seek an injunction prohibiting the state from enforcing these regulations, as well as monetary damages, attorney's fees and costs.

### I. Background

#### A. The Parties

The plaintiffs challenging the Rhode Island Bingo statute represent a varied cross-section of individuals, businesses, and organizations which are somehow involved in and/or benefited by the operation of the game of chance known as Bingo or Beano [hereinafter Bingo]. The plaintiffs are Allendale Leasing, Inc.; Louise LeBlanc; the Northern Athletic Club; the Darlington Braves, Inc.; Reali Bus Service, Inc.; and the New England Academy of TORAH [NEAT].

Allendale Leasing is a corporation which leases Bingo equipment, paraphernalia, and

game facilities and conducts Bingo games for various charitable organizations. Louise LeBlanc is the owner of Allendale Leasing, and has a criminal record consisting of four misdemeanor violations of the Bingo Laws. The Darlington Braves are a charitable organization which sponsors football and cheerleading programs for youths. The Northern Athletic Club is a charity which raises funds for scholarships for North Providence High School students. NEAT is a charitable organization providing residential religious education to Jewish youths. All three organizations fund a portion of their activities through proceeds from Bingo games, and the Northern Athletic Club and the Darlington Braves lease game facilities and equipment from Allendale Leasing. Finally, Reali Bus Service provides Bingo players with transportation to and from the games.

The named defendants in this action are the Attorney General of the state of Rhode Island and Colonel Walter E. Stone, director of the Rhode Island State Police. As head of the police department, Stone is directly responsible under the Bingo statute for licensing, regulating, and supervising the operation of Bingo games and for promulgating the implementing regulations. See R.I.G.L. § 11–19–40 and § 11–19–41.

## B. The Rhode Island Statute

The Bingo statute currently under attack by the plaintiffs was enacted by the Rhode Island Legislature in 1984. It supplanted a prior Bingo regulatory statute which was considerably less detailed and restrictive.[1]

1. *Compare* R.I.G.L. § 11–19–30 *et seq.* (1984 supp.), reproduced in full at Appendix A, *with* R.I.G.L. § 11–19–30, 11–19–30.2, and 11–19–31 (1981). The latter sections constituted Rhode Island's sole statutory regulation of Bingo prior to the enactment of the new law. They provided as follows:

11–19–30. Organizations permitted to operate bingo games—License.—Nothing in this chapter or in any other existing law of this state shall authorize the prosecution, arrest or conviction of any person for, or shall be construed to limit or prevent any religious, charitable, fraternal, civil, educational or veteran's organization from promoting, carrying on or conducting by its own members, serving without any compensation, which shall be interpreted to mean those persons in the actual management and control, the game commonly called "bingo" or "beano" or substantially the same game under any other name, in connection with which prizes are offered or awarded, provided, however, that the entire proceeds of the charges for admission to and participation in such game, after deducting expenses for rent, heat, light and equipment and other reasonable expenses, are applied solely to the purposes of such organization and that the total amount of all such expenses deducted shall not exceed twenty-five per cent (25%) of the gross receipts from such game, and provided, further, that prizes may be offered or awarded in the form of cash and merchandise provided that the combined amount of retail value of such merchandise and cash so offered or awarded as prizes shall not exceed the sum of three thousand dollars ($3,000) in any one (1) night provided that said game is carried on or conducted by such organization not more than once in any period of one (1) calendar week under a license hereby authorized to be granted for a fee not exceeding one hundred dollars ($100) for a specific date by the town council or the board of police commissioners or the bureau of licenses in the city of Providence or such other licensing authority as the case may be of any city or town in which such game is to be carried on or conducted upon application which shall set forth the name of the organization, the names and residence addresses of the principal officers and persons conducting such game and upon such other additional terms and conditions as the said licensing authority or said city or town may prescribe, provided there shall be only one (1) sponsor for each date of the proposed bingo or beano game, and provided, that such game shall be conducted only on the premises where such organization conducts its regular meetings; provided that any building in which said bingo game is played or conducted shall be so used no more than three (3) times in any calendar week and provided further that no annex or sub-division of said building shall be permitted in an attempt to increase the number of times said building may be used for bingo purposes, the intent being to eliminate so-called bingo parlors, provided, further, that no person under the age of eighteen (18) years shall be permitted to participate in such game. No lottery tickets shall be sold by any above enumerated organizations unless purchased from and/or authorized from the Rhode Island lottery.

Each such organization shall, within five (5) days after the holding of such game, render to the licensing authority of such city or town a full and complete report of its gross receipts and expenditures resulting from the holding

The new law fashions a comprehensive scheme for regulating the registration, licensing, and operation of Bingo game activities as well as for the enforcement of pertinent regulatory restrictions.

The statute, which is reproduced in full at Appendix A, establishes numerous requirements a charitable organization must meet in order to be properly registered by the state police to conduct Bingo games. R.I.G.L. § 11–19–31. It further sets forth specific conditions under which an application for registration shall be denied. *Id.* The statutory restrictions on the actual operation of Bingo games delineate who may participate in the game operation and what compensation they may receive; what percentage of gross game receipts may be applied to expenses; where the games may be conducted; and how frequently they may be held. R.I.G.L. § 11–19–32. The Bingo law also imposes certain limitations on the prizes that may be awarded,[2] and requires all organizations to maintain financial records which are to be available to the state police on demand. *Id.*

The Rhode Island Bingo law creates a detailed scheme for enforcing the requirements and restrictions listed above and for penalizing any violations. Under R.I.G.L.

§ 11–19–39 a charitable organization who willfully or knowingly violates a provision of the chapter may be subject to criminal liability. The provision also authorizes the state police to suspend or cancel an organization's registration to conduct Bingo games if it finds the organization has committed any violations, including making false or misleading statements in its registration application. Any person whose registration has been cancelled or suspended is entitled to a hearing before the department within thirty days of their hearing request. R.I.G.L. § 11–19–39(b).

The hallmark of the new Bingo law, however, is the section charging the state police with the implementation of its provisions. Section 11–19–40 instructs the director of the police department to promulgate rules and regulations that may be necessary to carry out the provisions of the chapter. In promulgating those rules, the director is to be guided by certain statutory standards setting forth conduct, conditions and activity deemed undesirable. They are as follows:

(1) Fraud: The practice of any fraud or deception upon a participant in a game of chance;

---

of such game, and showing the net proceeds resulting therefrom for use by such organization; provided further, that such organization file a report with the Division of Taxation on a quarterly basis, which shall include an indication of all funds on hand as well as those expended for charitable purposes with a list of all recipients of such funds by name, address and amount received. The licensing authority of each city or town shall annually, in the month of January, report to the city or town council on the reports received by it during the preceding year. Such organization shall maintain financial records of the conduct of such games which records shall be open for inspection and audit at reasonable times by the licensing authority of such city or town and its duly authorized employees and agents.

Failure to comply strictly with the provisions of this section and of the terms and conditions of such licensing authority shall result in a revocation of such license, and upon denial or revocation of such license, such organization shall be ineligible to be licensed for a period of ninety (90) days from such denial or revocation.

11–19–30.2. Bingo games—Announcement of prizes.—Prior to each drawing or contest conducted in any game of "bingo" or "beano" as provided in this chapter, the sponsor shall announce or cause to be announced openly and clearly, so as to provide the participants with a clear understanding of the amount to be paid as a prize for each individual drawing or contest in any game of "bingo" or "beano" as provided herein.

11–19–31. Improper conduct of bingo.—Any person promoting, carrying on or conducting the game commonly called "bingo" or "beano," or substantially the same game under any other name, contrary to the provisions of § 11–19–30 of § 11–19–30.2, shall be deemed guilty of a misdemeanor and upon conviction thereof, may be imprisoned for not exceeding thirty (30) days or be fined not exceeding five hundred dollars ($500).

**2.** For example, with the exception of "winner-take-all" games, the total prizes awarded in a single night may not exceed $3,000. R.I.G.L. § 11–19–32(e). In addition, "winner-take-all" games are limited to one per night. R.I.G.L. § 11–19–32(k).

(2) Unsafe premises: The conduct of games of chance in, at, or upon premises which may be unsafe due to fire hazard or other such conditions;

(3) Charitable funds: To assure that all the funds raised through bingo and charitable games are maintained and expended for bona fide charitable purposes;

(4) Advertising: That advertising for all games of chance and bingo is conducted in accordance with the rules and regulations.

Since the enactment of the Bingo law, the state police have adopted regulations pursuant to their statutory mandate. Although some regulations are merely reiterations of the statute's provisions, others impose supplementary requirements and restrictions on charitable organizations, as well as on businesses engaged in the leasing of Bingo equipment and facilities. Rather than attempting to distill the contents of the regulatory compilation here, the pertinent rules will be summarily described below in the context of the plaintiffs' legal challenges.

### C. Federal Constitutional Challenges

The plaintiffs bring this suit pursuant to 42 U.S.C. § 1983 seeking a declaration that a number of provisions of the Rhode Island Bingo law and certain regulations promulgated thereunder violate rights secured to the plaintiffs by the United States Constitution. Specifically, they claim that portions of the statute and regulations are unconstitutionally vague; unconstitutionally overbroad; a deprivation of the plaintiffs' First Amendment rights to freedom of expression and association; a deprivation of procedural due process; and a deprivation of their Fourteenth Amendment right to use their property in whatever lawful manner they desire.

### 1. First Amendment Challenges

The plaintiffs' First Amendment and overbreadth challenges are grounded in the theory that playing and conducting Bingo games is a form of expression and association that is protected activity under the Constitution. They claim that various statutory and regulatory provisions are time,

place and manner regulations which unduly burden their First Amendment rights. An exhaustive explanation of each of the plaintiffs' challenges would be a prolix exercise. Summarily, however, the plaintiffs contest the validity of the following provisions:

(1) The limitation of the game expenses to 25% of gross receipts, R.I.G.L. § 11-19-31;

(2) The requirement that the game be conducted exclusively by the sponsoring organization's members, R.I.G.L. § 11-19-32;

(3) The requirement that no one involved in the management or control of the game be compensated, R.I.G.L. § 11-19-32;

(4) The limitation on the total dollar amount of the prizes that may be awarded at any single event, R.I.G.L. § 11-19-32;

(5) The requirement that a given organization sponsor no more than two events per week, R.I.G.L. § 11-19-32;

(6) The requirement that each event have only one sponsor, R.I.G.L. § 11-19-32;

(7) The requirement that the games be conducted only on premises owned or affiliated with the sponsoring organization. R.I.G.L. § 11-19-32; and

(8) The requirement that a Bingo event shall not be conducted at any single facility in excess of three times per week. R.I.G.L. § 11-19-32.

The plaintiffs also challenge a number of the rules and regulations on First Amendment grounds, some of which merely mirror statutory provisions. Others elaborate on those restrictions and still others impose incidental and supplemental restrictions regulating, for example, the sale and leasing of Bingo equipment and facilities. *See e.g.* Rules and Regulations, Chap. 3, § IV.

### 2. Void for Vagueness

The plaintiffs invoke the constitutional doctrine of void for vagueness to challenge two distinct types of statutory and regulatory provisions. The first type are restrictions containing terms such as "reasonable," "fraudulent," "fraud on the public,"

and "health, safety and welfare of the state." According to the plaintiffs, because these purportedly oblique terms are not more specifically defined, they are constitutionally infirm. The plaintiffs specifically attack portions of R.I.G.L. § 11–19–31 which direct the state police to deny registration to an organization if the applicant has engaged in a fraudulent enterprise, if the proposed game would be a fraud on the public, or if the activities to be financed would be incompatible with the health, safety, and welfare of the state. They also challenge the requirement of R.I.G.L. § 11–19–32 that all expenses deducted from the gross receipts of a Bingo game be reasonable. Finally, they dispute the validity of a regulation requiring that all leases for Bingo equipment and facilities be commercially reasonable. Regulations, Rules and Chap. 3 § IV.

The plaintiffs also claim that a number of the state police's regulations are void for vagueness because they confer either unlimited or vaguely limited discretion on the police to approve game sites and leases and to create appropriate exceptions to general rules and restrictions. For example, the Rules and Regulations, Chap. 2, § III provides that in addition to the grounds specifically enumerated in the statute, an application for registration may be denied "... for any other valid reason as determined by the Department." Similarly challenged is a regulation which prohibits a person from working at Bingo games for more than one organization without the written approval of the State Police. Rules and Regulations, Chap. 3, § II. The plaintiffs contend that such rules are unconstitutionally vague because they reserve discretion in the police, which is unchecked by any meaningful, concrete standards. They also argue that the vagueness concerns are enhanced by the fact that the Bingo laws and regulations implicate First Amendment rights.

*3. Procedural Due Process Claim*

The plaintiffs next claim that R.I.G.L. § 11–19–39(b) is unconstitutional in that it allows the state police to deprive a Bingo registrant of a property interest without due process of law. That section authorizes the police to revoke registrations for good cause, and requires them to afford the registrants a post-suspension hearing if requested within fifteen days of notice of suspension. It further mandates that such hearing will be held within thirty days of the formal request. The plaintiffs argue that because the statute does not specify a time period within which the hearing officer must render a decision, it is constitutionally flawed.

*4. Claim to a Fourteenth Amendment Right in Property Owners to Dispose of Their Property in Any Lawful Manner They Desire*

Finally, the plaintiffs assert that the Bingo laws and regulations unconstitutionally restrict a property owner's right to use his property as he sees fit. They point particularly to the regulations governing the leasing and sales of Bingo facilities and equipment. *See e.g.* Rules and Regulation, Chap. 3, § III and § IV.[3]

*B. Pendent State Claims*

In addition to the Federal Constitutional claims enumerated above, the plaintiffs invoke the pendent jurisdiction of this court to interpose two state law claims. First, they allege that R.I.G.L. § 11–19–40, which allocates rulemaking responsibilities to the state police, fails to supply sufficient standards to guide the department in the exercise of that authority. Accordingly, they claim that the provision is an improper delegation of legislative power in violation of the Rhode Island Constitution. Alternatively, they argue that the regulations actually promulgated by the state police exceed the scope of authority granted them by the legislature. They presumably, therefore,

---

**3.** Chapter 3, § IV D of the Regulations places restrictions on corporations or other businesses engaged in the business of selling or renting Bingo Equipment. This provision reaches be-yond the primary focus of the Bingo regulation scheme, which emphasizes regulation of the licensing and game operation of the charitable organizations themselves.

seek a declaration that those regulations are void as *ultra vires.*

## II. DISCUSSION

### A. Jurisdictional Issues

After reviewing the plaintiffs' various claims, I conclude that this court's authority to adjudicate them is significantly circumscribed by the parameters of Article III of the United States Constitution. Article III restricts the judicial power of the federal courts to "cases and controversies" properly before them. First, I am constrained to dismiss the plaintiffs' procedural due process claim on the grounds that the proponents lack standing to assert it, and in any event, it is not yet ripe for review.[4] In addition, the Supreme Court in the recent decision of *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 85, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) held that the federal courts are without jurisdiction to compel state officials to comply with state law. *See id.* at 917. Accordingly, the plaintiffs' pendent state law claims must also be dismissed. Although the state of Rhode Island has neglected to raise these issues through the filing of appropriate motions, because they implicate the very jurisdiction of this Court, I must raise them *sua sponte.*[5]

### 1. Procedural Due Process Claim

As I have previously noted, the plaintiffs claim that the enforcement provisions of R.I.G.L. § 11–19–39(b) offend the constitutional guarantee of due process by failing to specifically provide for adequate post-suspension procedures. They assert that the statute, although it provides that a post-suspension hearing must be held within thirty days of a timely request, does not specify a time within which a decision must be rendered. None of the plaintiffs have alleged in their complaint that the State Police have failed to render a timely decision after a post-suspension hearing involving any of the plaintiffs or that there is a substantial likelihood that a prompt decision would not be rendered. Indeed, they have not even suggested that their registration to conduct Bingo games has been suspended pursuant to the challenged provisions or that such a suspension is imminent.

 Under Article III, federal judicial power is confined to actual "cases and controversies." A justiciable controversy "must be definite and concrete, touching the legal relationships of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Insurance Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937) (citations omitted). This constitutional jurisdictional limitation has spawned several justiciability doctrines including those of standing and ripeness. Recognizing the interrelationship between these two doctrines, I hold that the plaintiffs' procedural due process claims are nonjusticiable under either analysis.

First, the plaintiffs have not alleged the constitutional prerequisite for standing to sue in federal court. Article III requires that a plaintiff have a personal stake in the outcome of the litigation; this requirement is met only if the claimant can demonstrate a distinct and palpable injury to himself

---

4. The Article III doctrines of standing and ripeness are often analytically intertwined. A given anticipated injury may be characterized as non-justiciable because it is too remote to be ripe for review on one hand, or too remote to constitute the requisite concrete harm to satisfy the injury-in-fact requirement of standing. *See* Wright, Miller, and Cooper, § 3531.12. *See also Johnson v. Stuart,* 702 F.2d 193, 196 (9th Cir.1983); *Young v. Klutznick,* 652 F.2d 617 (6th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (1982); *Commonwealth Edison v. Train,* 649 F.2d 481, 483–84 (7th Cir.1980);

*Pence v. Andrus,* 586 F.2d 733, 736–39 (9th Cir. 1978).

5. Issues of standing and ripeness that implicate Article III are considered jurisdictional and must therefore be raised by the court at trial or even on appeal. *See California v. Bakke,* 438 U.S. 265, 268, 281 n. 14, 98 S.Ct. 2733, 2737, 2743 n. 14, 57 L.Ed.2d 750 (1978); *Juidice v. Vail,* 430 U.S. 327, 331–32, 97 S.Ct. 1211, 1215–16, 51 L.Ed.2d 376 (1977).

that has been caused by the challenged conduct and is redressable through a favorable judicial decision.[6] The plaintiffs here have simply not asserted that they have been injured in any way by the administrative procedures statutorily designated for Bingo registration revocation.

Although the concept of constitutionally sufficient injury is a flexible and amorphous one, it has undoubtedly not been demonstrated here. In some instances, courts have recognized injury that is quite abstract and remote. *See e.g., United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973) (finding sufficient injury caused to plaintiffs by rail freight surcharge which would arguably discourage use of recyclable goods, encourage greater use of virgin materials, and thus impair the pleasures of outdoor activities). In addition, the risk of future injury may be so tangible that it will be viewed as a present injury sufficient to support standing. *See DiMarzo v. Cahill,* 575 F.2d 15, 18 (1st Cir.), *cert. denied* 439 U.S. 927, 99 S.Ct. 312, 58 L.Ed.2d 320 (1978) (holding prisoners had standing to challenge fire hazards without demonstrating certainty of future injury or death). But even the most indulgent and sympathetic evaluation of the plaintiffs' lot compels the conclusion that they have sustained no injury, however remote, due to the challenged procedures. Because the procedures have not been invoked against them, they obviously cannot assert a present harm; and certainly the very existence of the provision neither influences their present conduct nor impairs the present enjoyment of their rights. Likewise, the mere possibility that the plaintiffs' registration might one day be suspended, that they might seek a post-suspension hearing pursuant to the statute,

and that the hearing examiner might fail to render a timely decision cannot reasonably be interpreted as a threat of future harm, much less one so tangible as to elevate it to the status of a present injury.

The plaintiffs' due process claim must also be held nonjusticiable on the ground that it is not yet ripe for review. The ripeness doctrine generally precludes federal courts from exercising jurisdiction over cases involving "uncertain or contingent events that may not occur as anticipated, or indeed may not occur at all." Wright, Miller and Cooper, § 3532. *See also Metzenbaum v. FERC,* 675 F.2d 1282, 1289–90 (D.C.Cir.1982). The instant claim rests on the paradigm hypothetical legal question that the ripeness doctrine bars. Indeed, it assumes not one, but two equally unlikely contingencies. First, the state police would have to revoke or suspend the plaintiffs' Bingo registration and second, they would have to actually fail to render a timely decision subsequent to a post-suspension hearing.

The centrality of either of these contingencies to the plaintiffs' claim for relief would, standing alone, render it nonjusticiable. Federal courts have routinely held that actions premised on the possibility of suit, prosecution, or administrative action are not ripe for review. At the very least, the potential injury asserted must be clearly impending. *See Hodel v. Virginia Surface Mining and Reclamation Ass'n,* 452 U.S. 264, 304, 101 S.Ct. 2352, 2374, 69 L.Ed.2d 1 (1981) (holding claim challenging civil penalty not ripe since none of claimants had been involved in civil penalty proceedings); *Vorbeck v. Schnicker,* 660 F.2d 1260 (8th Cir.), *cert. denied,* 455 U.S. 921, 102 S.Ct. 1278, 71 L.Ed.2d 462 (1981) (hold-

---

**6.** The triad of constitutional minima for standing—injury, causation, and redressability—are often collectively examined as injury in fact. *See* Tribe, American Constitutional Law (1978) p. 80–100. For our purposes, however, we need consider only the element of the plaintiffs' actual injury.

In addition to the constitutional threshold, of course, the federal judiciary has imposed "pru-

dential" barriers to access to the courts. These barriers include requirements that the plaintiff be within the zone of interest of the invoked statute or constitutional provision; that a claimant may not assert the rights of third parties; and that a plaintiff may not assert an injury which is common to the general citizenry. *See Warth v. Seldin,* 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975).

ing challenge to police department regulations not ripe because plaintiffs had never been disciplined under those regulations). In addition, a claim for relief may not be based on the possibility that a governmental authority will take unconstitutional action under a broad yet facially valid legal provision. Such a claim does not present a factual situation in which the validity of a statute is challenged in a true adversarial context. *Goodman v. Parwatikar*, 570 F.2d 801, 805–06 (8th Cir.1978); *Hometown Co-op. Apartments v. City of Hometown*, 515 F.Supp. 502, 505 (N.D.Ill.1981).

### 2. Pendent State Claims

The plaintiffs have appended two types of state law challenges to their federal constitutional suit; they contend that certain Bingo statutory provisions and regulations violate the state non-delegation doctrine and that a number of the state police regulations are void as *ultra vires*. The plaintiffs accordingly have requested that the state police be enjoined from enforcing them. I hold that the United States Supreme Court's recent decision in *Pennhurst v. Halderman, supra*, 103 S.Ct. at 900, directs dismissal of these claims on the ground that they are barred by the Eleventh Amendment to the United States Constitution.

■ The Eleventh Amendment provides "The Judicial power of the United States shall not be construed to extend to any suit in law or in equity, commenced or prosecuted against any one of the United States by Citizens of another State, or by Citizens or subjects of any Foreign State." Decisions of the Supreme Court rendered subsequent to the Amendment have interpreted the sovereign immunity it confers to extend beyond its literal terms. Thus "an unconsenting State is immune from suits

brought in federal court by her own citizens as well as by citizens of another state." *Employees v. Missouri Public Health & Welfare Dep't.*, 411 U.S. 279, 280, 93 S.Ct. 1614, 1616, 36 L.Ed.2d 251 (1973). *See also Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). In addition, the Eleventh Amendment not only bars suits against a State and its departments or agencies, but also against state officials where the relief sought would operate against the sovereign. *Hawaii v. Gordon*, 373 U.S. 57, 83 S.Ct. 1052, 10 L.Ed.2d 191 (1963) (*per curiam*). A judgment is deemed to operate against the State if it would expend itself on the public treasury, interfere with public administration, restrain the Government from acting, or compel it to act. *Dugan v. Rank*, 372 U.S. 609, 620, 83 S.Ct. 999, 1006, 10 L.Ed.2d 15 (1963).

In the landmark decision of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court recognized an important exception to the above cited prohibition of suits against state officials. It held that notwithstanding the Eleventh Amendment, a federal court may enjoin a state official from enforcing a state law that violated the Fourteenth Amendment to the United States Constitution. The holding in *Young* was premised on the theory that an unconstitutional statute is void, and that a state official acting pursuant to it is actually acting outside of the scope of his official responsibilities. Accordingly, he should be compelled to answer to his *ultra vires* acts. *Id.* at 160, 28 S.Ct. at 454. *Ex Parte Young*, therefore, permits federal courts to issue at least some types of injunctive relief against state officials for violation of state law.[7]

In *Pennhurst v. Halderman, supra*, 104 S.Ct. at 900, the Supreme Court held that

---

**7.** Notwithstanding the analysis of *Ex Parte Young*, the Supreme Court has held that the Eleventh Amendment bars certain retroactive injunctive relief. In *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Court held that in a suit against a state official alleging violation of federal law, a federal court may issue an injunction governing the

official's future conduct, but not one which compels the retroactive award of monetary relief. *Id.* at 666–67, 94 S.Ct. at 1357–58. The rationale for the distinction between the two types of injunctive relief is that the latter burdens the state treasury and is therefore in reality relief against the state.

the holding of *Ex Parte Young* does not extend to suits for prospective injunctive relief against state officials for violation of state, as opposed to federal law. The original suit in *Pennhurst* was instituted by a class of mentally retarded Pennsylvania citizens against various state and county officials. The plaintiffs alleged that the conditions maintained at Pennhurst State School and Hospital for the mentally retarded violated certain federal constitutional and statutory rights, as well as their rights under the Pennsylvania Mental Health and Mental Retardation Act of 1966. The District Court, invoking the authority of *Ex Parte Young*, issued an injunction against the defendants ordering them to conform their conduct to the requirements of the State statute.

The Supreme Court reversed the District Court's decision, rejecting its finding that the principles in *Young* were equally applicable to prospective injunctive relief issued against state officials for violation of state law. Writing for the Court, Mr. Justice Powell found that the *ultra vires* theory postulated in *Young* was in actuality a "necessary" fiction created to permit the vindication of supreme federal rights. *Pennhurst*, 104 S.Ct. at 910. He noted, however, that the need to reconcile the supremacy of federal law with the constitutional immunity of the states is wholly absent when a plaintiff alleges that a state official has violated state law. "In such a case the entire basis for the doctrine of *Young* and *Edelman* disappears." *Id.* at 911. In conclusion, the Court held that the Eleventh Amendment deprived the Court of Article III jurisdiction, which it otherwise would have had under principles of pendent jurisdiction, to entertain the plaintiffs' state law claims. *Id.* at 917–19.[8]

The plaintiffs in the instant action argue that *Pennhurst* does not bar their state law claims because the state of Rhode Is-

land has waived its sovereign immunity. In their support, they cite this Court's decision in *Marrapese v. Rhode Island,* 500 F.Supp. 1207 (D.R.I.1980). *Marrapese* held that Rhode Island, through its state tort claims act, had waived its Eleventh Amendment immunity to a suit under the Civil Rights Act challenging police officers' application of a carcinogenic chemical to an arrestee's skin.

I agree with the plaintiffs' contention that if Rhode Island has in fact waived its Eleventh Amendment immunity to the instant suit, *Pennhurst* is indeed inapplicable here. A waiver of sovereign immunity would remove any obstacle to a citizen's federal action against a state *qua* state, or to a suit for money damages against either the state or state officials in their official capacity. It is axiomatic that any bar to injunctive relief against a state official for an alleged violation of state law would likewise be removed. The pertinent questions before me, therefore, are first, whether the State has waived its immunity to suit in federal court, and second, whether any such waiver extends to the plaintiffs' suit.

■ It cannot be disputed that a State has the capacity to waive its Eleventh Amendment immunity. *See Clark v. Barnard,* 108 U.S. 436, 447, 2 S.Ct. 878, 883, 27 L.Ed. 780 (1883). In *Marrapese, supra,* I held that Rhode Island, through enacting its State Tort Claims Act, R.I.G.L. § 9–1–25, had consented to suit in federal court, at least in cases where the alleged constitutional violation arises from activities that are in the nature of tort at common law. *Marrapese,* 500 F.Supp. at 1209. *See also Naughton v. Bevilacqua,* 458 F.Supp. 610, 618 (D.R.I.1978), *aff'd* 605 F.2d 586 (1st Cir.1979); *Bowen v. Evanuk,* 423 F.Supp. 1341, 1342–43 (D.R.I.1976); *Laird v. Chrysler Corp.,* 92 F.R.D. 473, 474 (D.Mass.1981). Subsequent to my decision, the Rhode Island Supreme Court, on certifi-

---

**8.** Although this Court is constrained to apply the ruling of *Pennhurst* to the instant case, I note the danger that it will be applied in the future to limit further and further a plaintiff's access to the federal courts. Accordingly, I reserve an opinion as to whether, in certain circumstances diverging from those presented in *Pennhurst,* a federal court might constitutionally issue injunctive relief against state officials for violation of state law. *See* Shapiro, *Wrong Turns: The Eleventh Amendment and the* Pennhurst *Case,* 98 Harv.L.Rev. 61 (1984).

cation from the United States District Court for the District of Massachusetts, held that the state Tort Claims Act indeed waived the sovereign's immunity to suit in federal as well as state court. Accordingly the state had consented to be sued in federal court as a joint tortfeasor and for contribution and indemnity. *Laird v. Chrysler Corp.*, 460 A.2d 425, 427–30 (R.I.1983).

 It does not follow from the *Laird* decision, however, that Rhode Island has waived its immunity to the plaintiffs' claims in the case at bar. The relinquishment of Eleventh Amendment rights may not be lightly inferred. *Petty v. Tennessee-Missouri Bridge Commission*, 359 U.S. 275, 276, 79 S.Ct. 785, 787, 3 L.Ed.2d 804 (1959). Indeed, the Supreme Court has held that federal courts should find waiver "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974), quoting *Murray v. Wilson Distilling Company*, 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909).[9] This presumption that immunity has not been waived surely applies to the scope of a State's consent to be sued as well as to the existence of consent in the first instance.

 The statute from which this Court and the Rhode Island Supreme Court have construed an Eleventh Amendment waiver is one that expressly consents to suit in tort only. It provides that:

The state of Rhode Island and any political subdivision thereof, including all cities and towns, shall, subject to the limitations set forth in § 9–1–25, hereby be liable in all actions of tort in the same manner as a private individual or corporation, provided however, that any recov-

ery in any such action shall not exceed the monetary limitations thereof set forth in the chapter.
R.I.G.L. § 9–31–1.

This language has been construed to permit a suit against the State in federal court which is based either on a state tort action, *see e.g., Laird, supra*, 460 A.2d at 430 (permitting third party action for joint tortfeasor contribution and indemnity), or on a federal claim which is considered "traditionally tortious." *See Marrapese, supra*, 553 F.2d at 752 (§ 1983 action based on improper police conduct resembled battery); *Naughton, supra*, 458 F.Supp. at 610 (§ 1983 action based on improper medical treatment resembled negligent or intentional tort).

I think it obvious that the plaintiffs' state law claims neither state a cause of action in tort nor could be deemed tortious in nature. The state actions that the plaintiffs challenge—alleged *ultra vires* official acts and improper delegation of state power—are uniquely State acts. A private individual may simply not commit and be sued in tort for such acts. Thus, the plaintiffs' claims are clearly outside the scope of the statutory consent of the State to be held "liable in ... tort in the same manner as a private individual." R.I.G.L. § 9–31–1. Heeding the Supreme Court's directives in *Edelman, supra*, I cannot properly construe the State's waiver to extend beyond its literal terms.

Finally, as this Court noted in *Rhode Island Affiliate, American Civil Liberties Union, Inc. v. Rhode Island Lottery Commission*, 553 F.Supp. 752, 766 n. 9 (D.R.I. 1982), the Rhode Island legislature did not intend, through the enactment of its Tort Claims Act, to subject the State to liability for the discretionary and administrative acts of its subdivisions and officials. Con-

---

**9.** Federal Courts have encountered difficulties in applying the *Edelman* test to determine whether a state waiver of sovereign immunity impliedly waives immunity from suit in federal court. Rhode Island has found such a waiver from the implications of the circumstances preceding the passage of the State Tort Claims Act. *See Laird, supra*, 460 A.2d at 425. State waiv-

ers, however, are not a *per se* waiver of constitutional immunity in federal court. *Marrapese, supra*, 500 F.Supp. at 1214. *Cf.* Note, *Amenability of States to Section 1983 Suits: Reexamining Quern v. Jordan*, 62 B.U.L.Rev. 731, 749 (1982) (suggesting that waiver may be found only through express language).

sistent with this conclusion, the Rhode Island Supreme Court has denied recovery in state court to plaintiffs advancing such claims. *See Ryan v. State of Rhode Island Department of Transportation,* 420 A.2d 841, 843 (R.I.1980); *Calhoun v. City of Providence,* 120 R.I. 619, 390 A.2d 350, 356 & n. 5 (1978).

### 3. Related Abstention Issue

■■■ Having decided that this Court is without jurisdiction to entertain the plaintiffs' pendent state law claims, I find I am necessarily constrained to abstain from passing on the constitutionality of the challenged state police regulations. Except to the extent that the contested regulations mirror challenged statutory provisions, the plaintiffs' constitutional objections to the regulations need not be reached if the regulations are *ultra vires* as alleged. Since under *Pennhurst* I am prohibited from deciding the *ultra vires* question, I must abstain under the principles enunciated in the similar case of *Railroad Commission of Texas v. Pullman Company,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

■■■ The Supreme Court in *Pullman* held that where the resolution of an unsettled question of state law may obviate the need for a federal court to reach a constitutional issue, it should abstain pending an authoritative ruling on the question by a competent state tribunal.[10] Thus *Pullman* abstention imposes two prerequisites to its invocation: that a pertinent question of

state law be unsettled and that a ruling on the question would nullify a federal constitutional question. The latter requirement is clearly met in the instant case. A state court determination that the Bingo Regulations exceeded the scope of the State Police's regulatory authority would moot the plaintiffs' constitutional objections to those regulations.

■■■ As to whether the state law is unclear on the legality of the State Police's action, *Pennhurst* appears to bar a decision on the *ultra vires* issue in any event.[11] At the same time, this Court must "eschew the decision of cases on constitutional grounds unless and until all other available avenues of resolution [are] exhausted." *Aggarwal v. Ponce School of Medicine,* 745 F.2d 723, 726 (1st Cir.1984). In this particular situation, therefore, because I not only should not but indeed cannot resolve the potentially dispositive state law question, *Pullman* abstention appears mandatory. Accordingly, the plaintiffs' constitutional challenges to the State Police Bingo Regulations are dismissed [12] without prejudice, and this Court retains jurisdiction over those claims pending proceedings in the state courts pursuant to *American Trial Lawyer's Ass'n. v. New Jersey Supreme Court,* 409 U.S. 467, 469, 93 S.Ct. 627, 629, 34 L.Ed.2d 651 (1973).

### B. First Amendment Challenges

I now turn to the plaintiffs' First Amendment challenges to the various provisions

---

**10.** The holding of *Pullman* reflects the dual policies that a federal court should defer to a state court's interpretation of its own laws, and that a federal court should refrain from adjudication of a constitutional issue if a case could be decided on alternate grounds. *Pullman,* 312 U.S. 499–01, 61 S.Ct. 644–45.

**11.** The Court in *Pennhurst* essentially refused to extend the ultra vires theory of *Ex Parte Young* to circumstances where state officials acted outside of their authority under state as opposed to federal law. The Court stated that equitable relief would be denied where officials had committed an error of state law provided they were acting "within the scope of their authority." An official act within the scope of his authority so long as he is within the sphere of his official responsibilities. *Pennhurst,* 104 S.Ct. at 911. It is evident that even if the State Police violated

state law by promulgating regulations that were substantively broader than those authorized by statute, the promulgation of the regulations was "within the sphere of their official responsibilities" as defined by the Court in *Pennhurst. See id.*

**12.** This abstention analysis is not applicable to the constitutional challenges to those State Police regulations which merely mirror statutory provisions for two reasons. First, the constitutional questions could not be disposed of by a state court resolution of the *ultra vires* claims since, logically, regulations which reiterate statutory provisions cannot be *ultra vires.* Second, the constitutional issues raised by those regulations could not be avoided, since I must address them in addressing the constitutional challenges to the similar statutory sections.

of the Bingo Statute. The analytical framework that has been employed by federal courts to vindicate First Amendment values often involves the balancing of interests and is difficult to reduce to a single, definitive standard. Generally, however, the regulation of expression and association may take two basic forms; it may be aimed directly at the dissemination of ideas or information or it may restrict the flow of ideas and information consequent to the pursuit of a distinct governmental goal.

The first type of regulation, which actually focuses on ideas, subject matter, or content of expression, presumptively violates the First Amendment. *Police Department of the City of Chicago v. Mosley*, 408 U.S. 92, 95–96, 92 S.Ct. 2286, 2289–90, 33 L.Ed.2d 212 (1972) (striking down content related picketing prohibition). It is obvious that the Bingo laws and regulations neither seek to restrict the content of expression nor discriminate among speakers.

The second type of governmental restriction, sometimes referred to as "time, place, and manner regulation", is motivated by state interests unrelated to speech and expression, but has the effect of infringing on the free exercise of First Amendment rights. For example, a state, in an effort to control noise on public streets, might outlaw sound trucks in residential areas. In so doing, it effectively restricts the means through which ideas and information might be expressed. *See Kovacs v. Cooper*, 336 U.S. 77, 69 S.Ct. 448, 93 L.Ed. 513 (1949). Federal courts will uphold such regulation if it is reasonably related to important state interests and it does not unduly infringe on protected activity. *Id.* This standard of review requires a balancing of the competing interests. The court must consider the extent to which the protected activity is inhibited against the state interests that are vindicated through the regulation. *See Note, Less Drastic Means and the First Amendment*, 78 Yale L.J. 464 (1969).

■■■ Under a First Amendment balancing analysis, therefore, courts have struck down relatively direct interferences with protected activity where the relevant statutes were not narrowly drawn to serve the asserted legitimate state interest without unnecessarily interfering with First Amendment rights. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 786, 98 S.Ct. 1407, 1421, 55 L.Ed.2d 707 (1978). *See also Hynes v. Mayor of Oradell*, 425 U.S. 610, 620, 96 S.Ct. 1755, 1760, 48 L.Ed.2d 243 (1976) (striking down ordinance barring live entertainment); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (striking down election campaign expenditure limitations). On the other hand, courts will uphold reasonable regulations affecting free speech if they leave open effective alternative channels for expression. *Virginia Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976).

■■■ After reviewing the plaintiffs' various contentions, I conclude that the challenged statutory provisions simply do not infringe on protected First Amendment activity. It is therefore unnecessary and indeed impossible to balance the interests involved since the plaintiffs may assert no protected interest. Accordingly, the validity of the challenged laws and regulations must be assessed according to the less rigorous standards of the due process clause of the Fourteenth Amendment; they will be upheld provided they are not unreasonable in light of legitimate state objectives.

In determining whether governmental regulations interfere with protected First Amendment interests, it is necessary to initially identify the precise interest that the plaintiffs assert. The plaintiffs in this action have argued that their rights to freedom of expression and association somehow encompass a right to participate, in one manner or another, in the game of Bingo. I find that because a state government may totally prohibit the game of Bingo without running afoul of the First Amendment, the mere regulation of the

**1454**

game certainly cannot be deemed to violate First Amendment rights.

■ Bingo is a game of chance; in less euphemistic terms, it is commonly known as gambling. It cannot be gainsaid that a state government may lawfully prohibit gambling in the exercise of its police power, *Douglas v. Commonwealth of Kentucky*, 168 U.S. 488, 503, 18 S.Ct. 199, 204, 42 L.Ed. 553 (1897). Indeed, in many states gambling is forbidden by the State Constitution. *See, generally*, 54 C.J.S. 860, n. 3. It has never been seriously contended that such state constitutional provisions impair federally protected First Amendment rights.

Since a comprehensive ban on Bingo would not violate First Amendment rights, neither can less restrictive state regulation of the game. The legalization of a game of chance does not confer it with protected status under the First Amendment where none existed before. It is true, of course, that a government by establishing a new legal right, may incur new burdens and obligations. For example, once a state creates a right or privilege that it was under no constitutional compulsion to extend, it may not withdraw the right without affording constitutionally adequate procedures even though it could withhold it altogether. *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1967) (state may not condition employment benefits on relinquishment of free exercise rights). But the plaintiffs here assert a *First Amendment right* to play Bingo, not a statutory expectation. First Amendment rights are fundamental and static, and their existence or nonexistence may not be modified by a state legislature. Accordingly, I hold there is no First Amendment right to conduct or play Bingo, regardless of whether the game is completely prohibited or statutorily permitted subject to regulation.

In spite of the telling fact that states have outlawed Bingo and other forms of gambling without engendering any serious debate on the First Amendment propriety of such state action, the plaintiffs persist in their argument that Bingo is protected activity. In support of their proposition, they liken Bingo, as a form of entertainment, to protected expression such as films and dancing. I find this argument wholly unpersuasive.

The Supreme Court has indeed recognized that certain forms of entertainment as well as political speech, constitutes protected expression under the First Amendment. *See e.g., Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952) (holding coin operated mechanism for viewing live nude dancing expression); *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981) (holding motion pictures protected expression). In order to be accorded constitutional protection, however, entertainment must be designed to communicate or express some idea or information. *See Schad, supra*, 452 U.S. at 65, 101 S.Ct. at 2181 (nude dancing); *Erznoznik v. Jacksonville*, 422 U.S. 205, 208–10, 95 S.Ct. 2268, 2272–73, 45 L.Ed.2d 125 (1975) (drive-in movies); *Southeastern Promotion, Ltd. v. Conrad*, 420 U.S. 546, 556–58, 95 S.Ct. 1239, 1245–46, 43 L.Ed.2d 448 (1975) (stage musicals); *Schacht v. United States*, 398 U.S. 58, 62–63, 90 S.Ct. 1555, 1558–59, 26 L.Ed.2d 44 (1970) (street theatrical skits). Although the line between informing and entertaining may frequently be an elusive one, *Winters v. People of State of New York*, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948), I do not hesitate to hold that a Bingo game in itself is wholly devoid of the requisite communicative and informative elements.

Although the Bingo may involve interaction and communication between runners and participants, any such communication is singularly in furtherance of the game; it is totally divorced from a purpose of expressing ideas, impressions, feelings, or information unrelated to the game itself. For similar reasons at least two federal district courts and one state court of last resort have held that video games are outside of First Amendment protection. *See Malden Amusement Co., Inc. v. City of Malden*, 582 F.Supp. 297 (1983); *America's Best Family Showplace Corp. v. City of*

*New York,* 536 F.Supp. 170 (E.D.N.Y.1982); *Marshfield Family Skateland, Inc. v. Town of Marshfield,* 389 Mass. 436, 450 N.E.2d 605 (1983); *Caswell v. Licensing Commission For Brockton,* 387 Mass. 864, 444 N.E.2d 922 (1983). In *America's Best,* 536 F.Supp. at 174, the District Judge did not hesitate to uphold an ordinance banning video games. He stated, "I find … that although video games may be copyrighted, they 'contain so little in the way of particularized expression' that video games cannot fairly be characterized as a form of speech protected by the First Amendment." *Id.* Bingo, certainly, is even less a subject of constitutional protection than are electronic games. At least the latter could conceivably be conceptualized as the "author's expression of a particular idea or fantasy … transmitted to the consumer by means of audio and visual effects." *Caswell* 444 N.E.2d at 926. However the depiction of the operation of a Bingo game as creative expression eludes even the most fecund imagination.

■■■■ The plaintiffs have also argued that the Bingo law infringes on participants' rights to freedom of association. This contention must be rejected as well. First Amendment freedom of association guarantees people an opportunity to express their ideas through association with, or membership in, an identifiable group. *NAACP v. Button,* 371 U.S. 415, 430–31, 83 S.Ct. 328, 336–37, 9 L.Ed.2d 405 (1963); *NAACP v. Alabama ex rel. Patterson,* 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). Of course, this right extends to "forms of 'association' that are not political in the customary sense but pertain to the social, legal, and economic benefit of the members." *Griswold v. Connecticut,* 381 U.S. 479, 483, 85 S.Ct. 1678, 1681, 14 L.Ed.2d 510 (1965). The Supreme Court's recognition of freedom of association does not extend to a right of potential Bingo players to play Bingo. First, these players are not an identifiable group sharing common ideas and beliefs. While in some in-

stances the players may be members of the same group or club, their affiliation is with the club rather than a group of Bingo players. Second, even if Bingo players did constitute a recognizable group, gathering to play Bingo would not advance the social, legal, and economic benefits to the members in a sense that the Supreme Court would accept. The only interest advanced would be that of the individual who wins the Bingo game.

■■■ Although the plaintiffs may not assert a First Amendment right to play and conduct Bingo, they implicitly argue in the alternative that the Bingo laws and regulations, by placing some limitations on the fundraising capabilities of various charitable organizations, have an impact on their First Amendment right to propound their respective views and ideas. The plaintiff organizations do indeed have such a right; the operative question is whether the Bingo statute and regulations have impaired that right, either directly or indirectly. I believe they have not.

Plaintiffs rely heavily on the Supreme Court's recent opinion in *Secretary of State of Maryland v. Joseph H. Munson Company, Inc.,* —— U.S. ——, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984) to support their First Amendment challenges. In *Munson,* the Court held a Maryland statute placing a 25% limitation on charitable fundraising expenses was unconstitutionally overbroad because the percentage restriction on charitable solicitation unconstitutionally impinged on the solicitation activities. *Id.* at 2848–54. The plaintiffs argue that this holding is applicable to the expense limitation imposed by the statute and regulations on the operation of Bingo games. In doing so, they misperceive the analytical underpinnings of the Court's decision.

The Court relied primarily on the earlier case of *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980) in reaching its conclusion.[13] *Schaumburg* applied

---

**13.** *Munson* specifically addressed an issue left open in *Schaumburg*—namely whether a provision allowing the licensing authority to waive the percentage limitation where it would effec-

a heightened scrutiny to strike down a municipal ordinance providing that charitable organizations could receive and maintain a license authorizing door to door solicitation only upon "[s]atisfactory proof that at least seventy-five percent of the proceeds of such solicitations will be used directly for the charitable purposes of the organization. The ordinance explicitly excluded salaries and commissions of solicitors as well as various organizational administrative expenses from the definition of charitable purposes. *Schaumburg* 444 U.S. at 624, 100 S.Ct. at 829.

The Court's invalidation of the *Schaumburg* ordinance was not premised on a conclusion that fund raising in itself is inherently protected activity. It applied a heightened standard of review because the personal solicitation of funds by an organization is inextricably intertwined with the dissemination and promotion of the group's views or causes. The Court explained:

> Prior authorities, therefore, clearly establish that charitable appeals for funds, on the street or door to door, involve a variety of speech interests—communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes—that are within the protection of the First Amendment. Soliciting financial support is undoubtedly subject to reasonable regulation but the latter must be undertaken with due regard for the reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and for the reality

that without solicitation the flow of such information and advocacy would likely cease.

*Id.* at 632, 100 S.Ct. at 833.

Given these facts, the court concluded that a regulation of solicitation, because it imposed direct limitations on protected activity, must be narrowly tailored to achieve legitimate state objectives.[14]

The reasoning of *Schaumburg* is obviously inapposite to the instant case. The plaintiffs have not asserted that the Bingo game is necessarily intertwined with the propagation of the sponsoring organization's views. On the contrary, common knowledge would indicate that the game itself is a purely recreational/commercial activity. And even if the plaintiffs had alleged that sponsors often use Bingo games as a forum for their views, it would be absurd to argue that without the Bingo game "the flow of such information and advocacy would likely cease." *See Schaumburg*, 444 U.S. at 632, 100 S.Ct. at 833.

■■■ Finally, the plaintiffs suggest that the regulations, by restricting their ability to hold Bingo games, deprives them of the financial means to engage in protected speech and association. Once again, I certainly find no direct limitation on protected activity. The statute and regulations at issue merely regulate the game of Bingo; they do not impose direct limitations on monies an organization may spend or attain to further its causes. *See Buckley v. Valeo, supra,* 422 U.S. at 1, 96 S.Ct. at 612 (*per curiam* ) (striking down statutory limitations of campaign expenditures and con-

tively prevent the organization from raising contributions. *Munson,* 104 S.Ct. at 2850. The court found that the waiver provision fatally failed to give due consideration to the charity whose solicitation costs are high because it chooses to disseminate information as part of its fundraising.

The percentage limitation imposed by the Rhode Island Bingo Law also contains a waiver provision. However, because I find that the Bingo Law, unlike the solicitation ordinances in *Munson* and *Schaumburg,* do not implicate protected activity, it is unnecessary for me to ad-

dress the effect of the Bingo waiver provision on the First Amendment validity of the law.

**14.** The Court in *Schaumburg* concluded that the solicitation ordinances unduly intruded on the solicitors' First Amendment rights. While the Village's asserted interest in enacting the ordinance—to prevent perpetration of fraud on the public—was deemed a legitimate one, the Court concluded that it could be better served by measures less intrusive than a direct prohibition on solicitation. *Schaumburg,* 444 U.S. at 637–38, 100 S.Ct. at 836–37.

tributions).[15] At best plaintiffs can assert that the Bingo laws and regulations place some restrictions on how much money organizations could raise through conducting Bingo games. Under the most onerous circumstances, a charity, having been denied a license altogether, might be forced to initiate different fundraising projects to finance its operations. Under other circumstances, the amount an organization would raise through Bingo might be limited by regulatory ceilings on prizes or frequency of games. As to the plaintiffs' challenge to the expenditure limitations, they seem designed to bolster an organization's potential proceeds rather than to impair them. The only plaintiffs who might be financially harmed by those provisions are professional fundraisers and leasing companies. It would be attenuated indeed for them to argue that such potential fiscal harm would lead to a constitutionally cognizable consequence of an inhibition of the free exercise of their First Amendment rights. In any event, the impact of such limitations on the ability of any of the plaintiffs to freely exercise its First Amendment rights is far to diffuse and remote to constitute an interference with those rights.

The commercial act of collecting or raising funds, if it is totally divorced from expression interests, must be subject to reasonable government regulation. *Cf. Schaumburg, supra,* 444 U.S. at 635, 100 S.Ct. at 835 (suggesting ordinance would be enforceable against organizations whose speech interests were severable from fundraising activities). The mere fact that a law may indirectly affect an organization's financial wherewithal to conduct its activities cannot, standing alone, subject the law to strict scrutiny. Were it otherwise, the logical result would be that a plaintiff could invoke heightened review of any law or regulation limiting commercial activity;

he could simply espouse the theory propounded here that by limiting fundraising options, the state had impaired the facility with which he could exercise First Amendment rights. The fallaciousness of the plaintiffs' argument, accordingly, seems evident.

 Having found that the challenged Bingo law and regulations do not abridge First Amendment rights, I reject the plaintiffs' argument that heightened scrutiny of those provisions is warranted. Instead, their validity must be measured by the lowest level of scrutiny, the rational basis test. *See New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976). I find that the plaintiffs have failed to meet their onerous burden of proof in establishing that the Bingo laws and regulations are not legitimate and reasonable exercise of the state police power. The state has articulated the very important goal of prevention of fraud as justification for the scheme. While the regulations could have been more precisely drawn to achieve those goals, that is not the relevant inquiry here; I must refer to the legislature's judgment unless it was unreasonable. Accordingly, I find it unnecessary to provide a detailed discussion of the reasonableness of each separate challenged provision. I think it evident that each of them survives the appropriate scrutiny.

Finally, even assuming for the sake of argument that the Bingo laws may be characterized as infringing on First Amendment interests, the interference is so slight and indirect that a balancing of the relevant interests would likewise only require the state to show the reasonableness of the legislation. *See, e.g., Adderley v. Florida,* 385 U.S. 39, 87 S.Ct. 242, 17 L.Ed.2d 149 (1966); *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965); *Kovacs v. Cooper, supra,* 336 U.S. at 77, 69 S.Ct. at

---

**15.** In *Buckley v. Valeo,* the Court's invalidation of an election expenditure limitation was based on the fact that the purpose of the law was the

restriction of the quantity "of political communication and association by persons, groups,

448.[16] My conclusion, therefore, would not be altered.

#### C. Void for Vagueness and Overbreadth

Since I have held that Bingo laws do not abridge First Amendment values or interests in any conceivable scenario, the plaintiffs' facial challenge based on overbreadth is necessarily rejected. The plaintiffs have also contended, however, that the statute is facially void for vagueness. In the recent case of *Village of Hoffman Est. v. Flipside, Hoffman Est.*, 455 U.S. 489, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) the court stated:

> A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process. To succeed, however, the complainant must demonstrate that the law is impermissibly vague in all of its applications.

*Id.* at 497, 102 S.Ct. at 1193.

Without addressing the issue of whether the challenged provisions might be unconstitutionally vague in some imaginable application, it is clear that the plaintiffs have not made the requisite showing for a facial challenge.

#### D. Right to Use Property in Any Lawful Manner

The plaintiffs finally assert that the Bingo laws violate their due process rights to pursue their business. While they can claim such an interest, it is not a fundamental one. Accordingly, these challenges require only the minimal scrutiny that I have already undertaken, and thus clearly do not enhance the plaintiffs' claim for relief.

For the foregoing reasons, the plaintiffs' First and Fourteenth Amendment challenges to the Bingo Law and those regulations that mirror the statutory provisions are rejected. Accordingly, summary judgment is granted for the defendants. Plaintiffs' pendent state claims and procedural due process challenge are dismissed for want of federal jurisdiction. Finally, the plaintiffs' constitutional challenges of the State Police Regulations are dismissed without prejudice, and this court retains jurisdiction pending a resolution of pertinent state law questions by the Rhode Island state courts.

So ordered.

### APPENDIX A

### CHAPTER 19

### GAMBLING AND LOTTERIES

SECTION.

11–19–1. Promotion of lotteries.

11–19–30. Definitions.

11–19–30.1—11–19–30.3. [Repealed.]

11–19–31. Registration of charitable organizations.

11–19–32. Operation of bingo games.

11–19–33. Bingo games—Announcement of prizes.

11–19–34. Use of name of charitable organization to conduct games of chance.

11–19–35. Pull-tab lottery tickets.

11–19–36. Organizations permitted to conduct other games of chance.

11–19–37. Issuance of licenses.

11–19–38. Change of information.

11–19–39. Enforcement and penalties.

11–19–40. Rules and regulations.

11–19–41. Police regulation of bingo and games of chance.

11–19–42. Forfeiture of charter rights and privileges.

11–19–43. Acts of officers, directors, representatives, or agents acting within the scope of their authority.

candidates, and political parties...." *Id.* 424 U.S. at 18, 96 S.Ct. at 634.

**16.** In each of these cases, the challenged laws were upheld on reasonableness grounds and in each of these cases the relevant interference with the plaintiffs' First Amendment rights was indisputably greater than any interference conceivably caused by the Rhode Island Bingo law. In *Kovacs* the court upheld a statute banning broadcasting on the streets. The *Adderley* court upheld the convictions of protesters charged with trespassing on jailhouse property.

11–19–44. Remedies cumulative.

11–19–45. Severability.

**11–19–1. Promotion of lotteries.**—Every person not authorized by the Rhode Island state police who shall, directly or indirectly, set up, put forth, carry on, promote or draw, publicly or privately, any lottery, chance, game or device of any nature or kind whatsoever, or by whatsoever name the same may be called, for the purpose of exposing, setting for sale or disposing of any money, houses, lands, merchandise or articles of value, or shall sell or expose to sale lottery policies, purporting to be governed by the drawing of any public or private lottery, or shall sign or endorse any book, document or paper whatsoever, for the purpose of enabling others to sell or expose to sale, lottery policies, shall be deemed guilty of a felony and shall be imprisoned not exceeding two (2) years or be fined not exceeding two thousand dollars ($2,000), Provided, however, That any state, city, town, ward or district committee elected pursuant to the provisions of title 17, or certified candidates, but not both, as defined in title 17, shall be allowed to conduct that lottery commonly known as a "twenty (20) week club" or conduct a raffle once within a twelve-month period subsequent to notification to the Rhode Island Lottery Commission. For the purposes of this section a certified candidate shall not include any state, city, town, ward or district committee person.

**11–19–30. Definitions.**—The following definitions within this chapter shall apply:

(a) *Charitable organization*—Any benevolent, educational, philanthropic, humane, patriotic, social service, civic, fraternal, police, labor, religious, eleemosynary person and/or persons holding themselves out to be a charitable organization.

(b) *Charitable purpose*—Any benevolent, educational, humane, patriotic, social service, civic, fraternal, police, labor, religious, eleemosynary purpose provided that no part of the net earnings inures to the benefit of any private shareholder or individual.

(c) *Department*—The division of state police unless otherwise described.

(d) *Director*—The term director shall mean the superintendent of state police or his designee.

(e) *Game*—The game commonly called "Bingo" or "Beano" or substantially the same game under any other name.

**11–19–30.1—11–19–30.3. [Repealed.]**

**11–19–31. Registration of charitable organizations.**—No charitable organization which intends to conduct the game within the state of Rhode Island shall conduct such game unless it shall file a registration statement with the department upon prescribed forms and receives a certificate of approval.

In addition, in order to obtain a renewal of registration, such charitable organizations shall file the statements required by this chapter prior to June first of each year.

It shall be the duty of the president, chairman or principal officer of such charitable organization to file the statements required under this chapter. Such statements shall be sworn to and shall contain the following information:

(1) The name of the organization and the purpose for which it was organized.

(2) The principal address of the organization and the address of any officers in this state. If the organization does not maintain an office, the name and address of the person having custody of its financial records.

(3) The place where and the date when the organization was legally established and the form of its organization.

(4) The names and addresses of the officers, directors, and/or trustees of the organization and the names and addresses of officers, staff and/or members who receive a salary or any other form of compensation the source of which is the proceeds from the game subject to paragraph (9) hereof.

(5) A copy of the annual financial statement of the organization audited by an independent certified public accountant for

the organization's immediately preceding fiscal year, or a copy of a financial covering, in a consolidated report, complete information as to all the preceding year's fund-raising from the game showing kind and amount of funds raised, costs and expenses incidental thereto, and allocation or disbursements of funds raised.

(6) The general purpose or purposes for which the proceeds from the game shall be used.

(7) The name or names under which it intends to conduct the game.

(8) The names of the individuals or officers of the organization who will have final responsibility for the custody of the proceeds from the game.

(9) A listing of the names, addresses and the compensation of all individuals, directors, officers, agents, servants and/or employees of the organization who receive compensation, commission, or other remuneration, directly or indirectly from the gross receipts of the game, in excess of seven hundred fifty dollars ($750) annually.

(10) The names of the individuals or officers of the organization responsible for the final distribution of the proceeds. The director or his designee shall examine each initial application of charitable organizations for the right to conduct a game and each renewal application of charitable organizations for the right to conduct a game and if found to be in conformity with the requirements of this chapter and all relevant rules and regulations it shall be approved for registration.

(b) The registration forms and any other documents prescribed by the department shall be signed by an authorized officer, an independent public accountant, and by the chief fiscal officer of the charitable organization and shall be verified under oath.

(c) The department shall make or cause to be made such investigation of any applicant as it shall deem necessary. As a result of its investigation and action, the department shall certify to the local police department or local licensing authority its approval or disapproval of the application. No applicant shall be approved if one or more of the following facts is found to exist:

(1) That one or more of the statements in the application are not true.

(2) That the applicant is or has engaged in a fraudulent transaction or enterprise.

(3) That the game would be a fraud upon the public.

(4) That the game expenses during any of the three (3) years immediately preceding the date of application have exceeded twenty-five percent (25%) of the total gross money or gross receipts raised or received by reason of the game. In the event special facts or circumstances are presented showing that expenses higher than twenty-five percent (25%) were not unreasonable, the department, pursuant to rule and regulation, has the discretion to allow such higher expenses.

(5) That the expected cost of conducting the game for the specific year for which the application will exceed twenty-five percent (25%) of the total gross money or receipts to be raised or received by reason of the game.

(d) That such activities to be financed will be imcompatible with the health, safety or welfare of the state of Rhode Island.

**11-19-32. Operation of bingo games.—** Any charitable organization approved by the department may promote, carry on or conduct the game provided as follows:

(a) The game is conducted by members of the organization.

(b) No person in the actual or constructive management and control of the game receives any compensation for services connected to the game or receives any compensation from the gross receipts of the game.

(c) The entire net receipts of the game excluding the charges for admission ticket to and participation in the game are applied solely to the charitable purposes of the organization. All expenses deducted from gross receipts must be reasonable and related to the actual conduct of the game.

(d) The total amount of all expenses deducted from the gross receipts shall not

exceed twenty-five percent (25%) of the total annual gross receipts raised through bingo, not including monies raised through the sale of pull-tab lottery tickets.

(e) The total prizes, in the form of cash and/or retail merchandise excluding prizes from winner-take-all games, which are offered or awarded does not exceed the sum of three thousand dollars ($3,000) in any one night.

(f) The game is carried on or conducted not more than twice in any period of one (1) calendar week under a license issued pursuant to the provisions of § 11–19–38.

(g) That there be only one (1) sponsor for each date of the proposed game and that such game shall be conducted only on the premises affiliated with such organization in conformance with rules and regulations.

(h) That any building in which such game is played or conducted shall be used no more than three (3) times in any calendar week for conducting a game and provided further that no annex or subdivision of any building shall be permitted to be used to conduct a game in an attempt to increase the number of times said building may be used for bingo purposes.

(i) The organization shall keep and maintain financial records relating to the game in accordance with rules and regulations and have said records available for inspection upon demand.

(j) Payment of a prize in excess of two hundred fifty dollars ($250) shall be made by check.

(k) "Winner-take-all" games are prohibited, with the exception that each organization shall be permitted to play one (1) optional "winner" take-all game per night.

(*l*) No person under the age of eighteen (18) years shall be permitted to play the game.

**11–19–33. Bingo games—Announcement of prizes.**—Prior to each drawing or contest conducted in any game of "bingo" or "beano" as provided in this chapter, the sponsor shall announce or cause to be announced openly and clearly, so as to provide the participants with a clear understanding of the amount to be paid as a prize for each individual drawing or contest in any game of "bingo" or "beano" as provided herein.

**11–19–34. Use of name of charitable organization to conduct games of chance.**—A charitable organization within the provisions of §§ 11–19–30 and/or 11–19–31, shall not allow or permit any individual, partnership, corporation or any other entity to utilize the name of the charitable organization for the purpose of conducting or promoting bingo or other games of chance.

**11–19–35. Pull-tab lottery tickets.**—The Rhode Island lottery commission is hereby empowered to sell and regulate the sale of pull-tab lottery tickets to religious, fraternal, civic, educational, veterans' or charitable organizations. The commission shall determine, consistent with this section, those organizations that are authorized to sell such pull tab lottery tickets and shall insure that the pull tab lottery tickets to be distributed are secured for the purposes under which they are to be sold in terms of concealing the result of said tickets until such time as they are sold to the general public. Consistent with this section, those organizations authorized to sell said tickets are authorized to retain net profits as shall have been provided for by the commission.

Notwithstanding any other section of the general laws to the contrary, said pull tab lottery tickets are hereby declared to be legal.

**11–19–36. Organizations permitted to conduct other games of chance.**—Any charitable organization may promote, carry on or conduct any game of chance authorized by the division of state police is connection with which prizes or prize monies are offered or awarded, provided as follows:

(a) The game is conducted by members of the organization.

(b) No person in the actual or constructive management and control of the game receives any compensation for services connected to the game.

(c) The entire net receipts of the game, including the charges for admission to and participation in the game are applied solely to the bona fide charitable purposes of the organization.

(d) That the organization be granted a license issued pursuant to the provisions of § 11–19–38.

(e) That the provisions of this section shall not apply to that lottery commonly known as a "twenty-week club" or a raffle conducted by a charitable organization.

**11–19–37. Issuance of licenses.**—Any charitable organization within the provisions of §§ 11–19–30 and/or 11–19–31 may be granted a license to conduct the game of bingo or other game of chance authorized by the department.

(A) *Bingo*—A license for the game of bingo shall be obtained as follows:

(1) The charitable organization shall annually apply for approval to the department pursuant to § 11–19–31;

(2) Upon the receipt of notification of approval from the department the charitable organization shall apply to the local licensing authorities upon forms furnished and pay the local licensing fee, if any;

(3) The local licensing authority shall issue the license. A copy of the license shall be forwarded to the department by the local licensing authority;

(4) The local licensing authority shall issue the license for a specific date or dates or a specific day or days during each calendar week;

(5) Within seven (7) calendar days of the completion of every game of bingo, the charitable organization shall file a financial report, upon forms furnished by the department with the department and with the local licensing authority if it so requires.

(B) *Other games of chance.*—

(1) The charitable organization shall apply for approval to the department pursuant to § 11–19–37;

(2) Upon the receipt of a notification of approval from the department, the charitable organization shall apply to the local licensing authority upon forms furnished

by the department and pay the local licensing fee, if any;

(3) The local licensing authority shall issue the license. A copy of the license shall be forwarded to the department by the local licensing authority;

(4) The local licensing authority shall issue the license for a specific date or specific day or days.

(5) The application for the local license shall be made at least thirty (30) days prior to the date or day for which the license is issued;

(6) Within thirty (30) calendar days of the completion of the game of chance, the charitable organization shall file a financial report upon forms furnished by the department, with the department.

**11–19–38. Change of information.**—If, subsequent to approval by the department pursuant to § 11–19–31, there is a change in any information furnished by the organization to the department the organization shall so inform the department within seven (7) days of the change. Failure to inform the department within seven (7) days will result in the automatic suspension of approval for a period of three (3) months.

**11–19–39. Enforcement and penalties.**—(a) If any charitable organization fails to file any registration application or statement, report, or other information required to be filed by the department under this chapter, or otherwise violates the provisions of this chapter, the department shall notify the delinquent charitable organization, by mailing a notice, certified mail, with return receipt requested, to its or his last known address. If the required registration application or statement, annual report or other information is not filed or if the existing violation is not discontinued within ten (10) days after the formal notification or receipt of such notice the department may cancel, suspend the registration of such or refuse to accept [a] delinquent report from [the] charitable organization.

(b) The department, upon its own motion or upon complaint of any person, may, if it has reasonable ground to suspect a viola-

tion, investigate any charitable organization, to determine whether such charitable organization has violated the provisions of this chapter or has filed any application or other information required under this chapter which contains false or misleading statements. If the department finds that any application or other information contains false or misleading statements, or that a registrant under this chapter has violated the provisions thereof, the registration may be suspended or cancelled. Any person whose registration is suspended or cancelled may, within fifteen (15) days from the date of written notification of such suspension or cancellation request, in writing, a hearing before the department, which hearing shall be held within thirty (30) days from the date of the request. Any person who has exhausted all administrative remedies available to him within the department in accordance with the administrative procedures act (chapter 35 of title 42) and who is aggrieved by a final decision of the department is entitled to judicial review in accordnace with the provisions of said administrative procedures act (chapter 35 of title 42).

(c) The certificate of approval of any charitable organization, which knowingly makes a false or misleading statement in any registration application or statement, report or other information required to be filed by the department or this chapter shall be revoked.

(d) In addition to the foregoing, any person who willfully and knowingly violates any provisions of this chapter, or who shall willfully and knowingly give false or incorrect information to the department in filing statements or reports required by this chapter, whether such report or statement is verified or not shall be guilty of a misdemeanor, and, upon conviction thereof, shall be sentenced for the first offense to pay a fine of not more than one thousand dollars ($1,000) or undergo imprisonment for not more than one year, or both, and for the second and any subsequent offense to pay a fine of not more than five thousand dollars ($5,000) or to undergo imprisonment for not more than five (5) years, or both.

(e) Whenever the attorney general shall have reason to believe or the attorney general has been advised by the director (who shall have given due notice and full hearing to the charitable organization) that the said charitable organization is operating in violation of the provision of this chapter or has knowingly and willfully made any false statements in any initial or any renewal application or in any other information required to be filed by this chapter or whenever a charitable organization has failed to file a registration statement required by this chapter, or whenever there is employed or is about to be employed by a charitable organization any device, scheme or artifice to defraud or to obtain money or property by means of any false pretense, representation or promise, or whenever the officers or representatives of any charitable organization failed after notice to produce any records of such organization, or whenever the funds raised by the game are not devoted or will not be devoted to the charitable purposes of the charitable organization, in addition to all other actions authorized by law, the attorney general of the state of Rhode Island may bring an action in the name of the state of Rhode Island against such charitable organization and its officers, or any other person who has violated this chapter to enjoin such charitable organization or person from continuing such violation, doing any acts in furtherance thereof and for such other relief as the court deems appropriate. The court may make such additional orders and/or judgments as may be necessary to restore to anyperson in interest any monies or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful. The department may refuse to grant an initial application to conduct a game, may refuse to renew an application and may revoke a registration of any charitable organization, which knowingly makes a false statement in any initial registration application or renewal application or statement, annual report or other information required to be filed by the department or the chapter.

**11-19-40. Rules and regulations.**—The director shall adopt and issue rules and regulations as may be necessary to carry out the provisions of §§ 11-19-30—11-19-40. Such rules and regulations shall be promulgated in accordance with chapter 35 of title 42.

In promulgating such rules and regulations, he shall, in addition to the standards set forth in other provisions of this chapter, be guided by the following standards setting forth conduct, conditions and activity deemed undesirable:

(1) Fraud: The practice of any fraud or deception upon a participant in a game of chance;

(2) Unsafe premises: The conduct of games of chance in, at or upon premises which may be unsafe due to fire hazard or other such conditions;

(3) Charitable funds: To assure that all the funds raised through bingo and charitable games are maintained and expended for bona fide charitable purposes;

(4) Advertising: That advertising for all games of chance and bingo is conducted in accordance with rules and regulations.

The director may promulgate less stringent regulations for those charitable organizations who do not intend to run any such games more than once in any consecutive six-month period, and also for those charitable organizations where the prize for any such game will not exceed three hundred dollars ($300).

**11-19-41. Police regulation of bingo and games of chance.**—The division of state police shall have the power and authority to license, regulate, supervise and exercise general control over the operation of bingo and games of chance including, but not limited to, the conduct of such games of chance, the distribution of prizes, the use and licensing of equipment specifically designed to be utilized to conduct bingo and games of chance as well as the licensing of persons, firms, corporations in the business of the sale and rental of equipment concerning bingo and games of chance. The Rhode Island state police shall have the power and authority to investigate as to the direct or indirect ownership or control of any licenses and to revoke or suspend any license for just cause after hearing.

**11-19-42. Forfeiture of charter rights and privilieges.**—Upon conviction for a violation of this chapter or upon revocation of a certificate of approval, the attorney general may apply to the superior court:

(1) For the forfeiture of any charter rights, franchise privileges or powers of such corporation held by such person under the laws of this state;

(2) for dissolution, if the person is a corporation or limited partnership organized under the laws of this state; or

(3) for the suspension of the privilege to exist within this state.

The court, after giving due consideration to the public interest and to relevant competitive and economic circumstances, may grant so much of the requested relief as is deemed appropriate. A dissolution shall be conducted in accordance with the procedures specified by law for either voluntary or judicial dissolution of the particular type of corporation, association, firm or partnership.

(b) If any corporation, association, partnership, or limited partnership shall be dissolved or have its privilege to exist in this state suspended or revoked as provided in subsection (a) of this section, no assignee, transferee, or successor-in-interest of such corporation, association, partnership, or limited partnership shall be permitted to incorporate or to transact business in this state without first applying to the court for and receiving an order permitting incorporation or transaction of business. No order shall be granted unless the applicant proves to the satisfaction of the court that it will conduct its affairs in accordance with all applicable laws.

**11-19-43. Acts of officers, directors, representatives, or agents acting within the scope of their authority.**—(a) A corporation, association, firm, partnership, or limited partnership is liable for the acts of its officers, directors, representatives, or

agents acting within the scope of their authority. Proof of the acts of any such officer, director, representative, or agent shall be received as prima facie proof of the acts of the corporation, association, firm, partnership, or limited partnership itself.

(b) When a corporation, association, firm, partnership, or limited partnership violates this chapter, such violation shall be deemed to be that of the individual directors, members, officers, managers, employees, or agents of the corporation, association, firm, partnership, or limited partnership who knowingly authorized, ordered, aided, abetted, or advised in the acts or omissions constituting in whole or in part the violation, whether the individuals acted on their own behalf and for their own benefit, or for the corporation, association, firm, partnership, or limited partnership and in their representative capacity. The individuals in their capacity as individuals, are subject to the provisions of this chapter and may be joined, if subject to personal jurisdiction, as additional parties defendant in the proceedings against the corporation, association, partnership, or limited partnership.

**11–19–44. Remedies cumulative.**—The remedies provided in this chapter are cumulative of each other and of existing powers and remedies inherent in the court.

**11–19–45. Severability.**—If any section of this chapter or the application thereof to any person or circumstance is held invalid by a court of competent jurisdiction, the remainder of the chapter and the application of such section to other persons or circumstances shall not be affected thereby. The invalidity or unconstitutionality of any section or sections or part of any section or sections of this chapter shall not affect the validity of the remainder of this chapter and to this end the sections of this chapter are severable.