AMERICA'S BEST FAMILY SHOW-
PLACE CORP., Plaintiff,

v.

The CITY OF NEW YORK, DEPT. OF BUILDINGS, Irwin Fruchtman, Commissioner, and Dept. of Consumer Affairs, Bruce C. Ratner, Commissioner, Defendants.

No. 81 Civ. 4087.

United States District Court,
E. D. New York.

March 3, 1982.

---

Sheldon D. Camhy, Shea & Gould, New York City, for plaintiff.

Frederick A. O. Schwarz, Jr., Corp. Counsel, New York City (Michael S. Simon, New York City, of counsel), for the City of New York.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

Plaintiff, America's Best Family Showplace Corp., brings this action to challenge the constitutionality of various New York City zoning and licensing laws that regulate coin operated video games.

Plaintiff succeeds the operator of a defunct restaurant on Woodhaven Boulevard in Queens. It now seeks to reopen the restaurant, but with a new twist: it wants to install forty dining tables in which are embedded coin operated video game machines. According to the plaintiff, the addition of these games will insure success, while their absence will almost certainly spell financial doom for the restaurant.[1]

Plaintiff brings this action because the City's regulatory scheme effectively precludes it from obtaining a license to operate its restaurant in accord with its video game plan. In fact, the Queens Borough Superintendent has written in bold letters across a letter from plaintiff's architect describing the plan: "No more than 4 devices permitted." Rather than risk criminal and civil penalties, plaintiff seeks a declaration that the City's scheme violates its First and Fourteenth Amendment rights and its civil rights under 42 U.S.C. § 1983. Plaintiff also demands a preliminary and permanent injunction to enable it to open its restaurant without fear of civil liability or criminal prosecution.[2]

*The Statutory Scheme*

Several interrelated licensing and zoning laws and regulations governing coin operated video game machines or "common shows" are involved in this action.[3] The City prohibits the operation of any common show without a license from the Commissioner of the Department of Consumer Affairs. New York City Admin.Code, Article 5, § B32–41.0.

The City's "Regulations Relating to Common Shows" ("Regulations") set forth the

---

1. The restaurant is located in a C–2 commercial zone, adjacent to Forest Park on one side, and surrounded by a largely residential community on the others. The restaurant has a Certificate of Occupancy for Use Group 6 which permits it to operate as an eating and drinking establishment with incidental musical entertainment as an accessory use. A supermarket and a country western bar-restaurant that provides live music are located next to the restaurant. Within a few hundred yards, there are a couple of gas stations, a delicatessen, and other commercial establishments.

2. The City is vigorously enforcing its laws in several civil and criminal actions in the state courts. The Court denied the City's motion to dismiss on case and controversy and abstention grounds in a Memorandum and Order, dated January 19, 1982, 530 F.Supp. 607 (D.C.).

3. Common shows are defined in Section B32–40.0 of Article 5 of the City's Administrative Code to include the type of coin operated video game machines plaintiff wishes to install in its restaurant.

criteria for issuing the licenses. Section 1 provides that a license will be granted to an operator of one to four games so long as the facility is one of over seventy-five types of retail, service or amusement establishments.[4] The City has issued roughly 4,500 such licenses. Defendants' Exhibit 9.

If the prospective licensee wishes to install more than four video games, the City's Administrative Code provides that the establishment will become an "arcade." Section B32–40.0 of the Code defines an arcade as "any facility which shall have five (5) or more common show games."[5] A license to operate an arcade, however, is not simple to obtain. Section 2 of the Regulations provides that an arcade "shall be located in such place as the Commissioner shall, in his sole discretion, approve. It shall be located in premises within zoning areas where such arcades are permitted and where the current certificate of occupancy permits such use." See also Regulation § 4(b).

Thus, anyone who wishes to install more than four video games must, at the very least, show that the establishment is in a zone which permits arcades as a "use", and that it has a certificate of occupancy for such "use".[6] However, the New York City Department of Buildings will not issue a Certificate of Occupancy for establishments with more than four video games in Use Group 6 establishments, such as plaintiff's.

Memoranda, Department of Buildings, dated October 7, 1975 and November 16, 1981. In addition, the City's zoning laws provide that arcades may be permitted only in C7, C6, C4–1, M2 and M3 types of zones. Arcades are uses permissible as of right in C7 commercial zoning districts. City Zoning Resolution, § 32–24. There are only a few of these zones, located mainly in Rockaway, Queens, Coney Island, Brooklyn, and portions of the Times Square area of Manhattan. Subject to certain restrictions, special permits may be obtained to operate an arcade in C6, C4–1, M2 and M3 commercial and zoning districts. City Zoning Resolution, §§ 73–35, 74–47.[7] These zones are located throughout the city. Despite these restrictions, approximately forty-five special permits were issued in the last two years. Of course, in addition, the possibility of obtaining a variance is available in all zones.[8] The City has provided evidence that at least five variances have been issued for arcades.

The impact of the City's regulatory scheme is clear to anyone who takes a walk down any commercial block. Small establishments with up to four video games are omnipresent, while only a few establishments containing more than four games are to be seen.

4. These include restaurants, such as plaintiff's, as well as diverse establishments such as laundromats, donut shops, pool halls, candy stores, gift shops, record stores, skating rinks and shoe or hat repair shops. Defendants' Exhibit 12.

5. Thus, plaintiff's restaurant, if operated in accord with its plan, would, by definition, become an arcade.

6. A "use" is simply a category listing a group of uses to which a facility can be put. For example, plaintiff's restaurant is in a C–2 zone, which permits "Use Group 6," as well as other uses. Plaintiff has a certificate of occupancy for Use Group 6. The uses permitted in this Group include eating and drinking places with incidental musical entertainment. Use Group 6 does not list arcades as a permissible use.

7. Permits to operate in C4–1, M2 and M3 zones may be obtained from the Board of Standards and Appeals. A permit will be granted for arcades only in shopping centers and only where there are no street entrances or signs. § 73–35. Permits to operate in C–6 zones may be obtained from the City Planning Commission. A permit will be issued only in department stores with a floor area of over 150,000 square feet, or transportation or office buildings with a floor area of over 500,000 square feet and only where there are no signs or entrances facing a street. § 74–47.

8. The Board of Standards and Appeals may issue a variance from the prescribed uses within a zone upon a showing that the requirements set forth in § 72–21 of the Zoning Resolution have been met. Chief among these is a finding that the physical conditions of the building for which a variance is sought somehow render it unfit for the uses permitted and "that the grant of a variance is therefore necessary to enable the owner to realize a reasonable return from such zoning lot."

*Preliminary Injunction*

To obtain preliminary injunctive relief, plaintiff must demonstrate (1) irreparable injury and (2) either (a) probable success on the merits or (b) sufficiently serious questions going to the merits to make those questions a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. *Jackson Dairy v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979); *Caulfield v. Board of Education of City of New York*, 583 F.2d 605, 610 (2d Cir. 1978). Plaintiff's inability to reopen an economically viable restaurant may be fairly regarded as an irreparable injury. The question thus distils to whether either of the second elements for the injunction may be found.

*Probable Success on the Merits*

A dispositive threshold question is whether video games are speech or expression protected by the First Amendment.[9] If they are not, the likelihood of plaintiff's success on the merits at trial is minimal, given the traditionally heavy presumption of constitutionality accorded to a local government's exercise of its zoning powers. *See Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 2187, 68 L.Ed.2d 671 (1981) (Blackmun, concurring).

Plaintiff describes video games as "visual and aural presentations on a screen involving a fantasy experience in which the player participates." Plaintiff's Memorandum of Law at 3. According to plaintiff, these presentations are similar to motion pictures, which are admittedly protected speech. Because the City's regulatory scheme substantially infringes on the exercise of this protected speech, plaintiff argues that it must be struck down as unconstitutional. *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S.

495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952). *See also Stern Electronics, Inc. v. Kaufman*, 523 F.Supp. 635 (E.D.N.Y.1981), *aff'd*, 669 F.2d 852 (2d Cir. 1982);[10] *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981).

The case on which plaintiff principally relies, *Schad v. Borough of Mt. Ephraim*, involved a coin operated mechanism which permitted a customer "to watch a live dancer, usually nude, performing behind a glass panel." 101 S.Ct. at 2181. Mt. Ephraim's zoning ordinance totally banned all forms of live entertainment within the town. The Supreme Court found that this "entertainment" was protected by the First Amendment and that the town had not "adequately justified its substantial restriction of protected activity." *Id.* at 2184.

This Court, however, is not persuaded that plaintiff's video games, unlike the nude dancing in *Schad*, are a form of speech protected by the First Amendment.[11] While the Supreme Court stated in *Schad* that "[e]ntertainment, as well as political and ideological speech, is protected . . . ," it seems clear that before entertainment is accorded First Amendment protection there must be some element of information or some idea being communicated. *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 556–58, 95 S.Ct. 1239, 1245–46, 43 L.Ed.2d 448 (1975). That element is clearly lacking here.

In *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), the Supreme Court first held motion pictures to be protected speech. The Court there stated:

It cannot be doubted that motion pictures are a significant medium for the communication of ideas. They may affect public attitudes and behavior in a

---

9. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . ." This Amendment is made applicable to the states by the Fourteenth Amendment. *Edwards v. South Carolina*, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963).

10. In this copyright case, District Judge Nickerson described a video game as a "[m]ovie in

which the viewer participates in the action as the fearless pilot controlling the spaceship."

11. Dancing, in all its non-obscene forms, has long been considered a form of expression protected by the First Amendment. *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975).

variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression. *The importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform.* As was said in *Winters v. People of State of New York*, 1948, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840:

> The line between the informing and the entertaining is too elusive for the protection of that basic right [a free press]. Everyone is familiar with instances of propaganda through fiction. What is one man's amusement, teaches another's doctrine.

343 U.S. at 501, 72 S.Ct. at 780 (emphasis added).

■ In no sense can it be said that video games are meant to inform. Rather, a video game, like a pinball game, a game of chess, or a game of baseball, is pure entertainment with no informational element. That some of these games "talk" to the participant, play music, or have written instructions does not provide the missing element of "information." I find, therefore, that although video game programs may be copyrighted, they "contain so little in the way of particularized form of expression" that video games cannot be fairly characterized as a form of speech protected by the First Amendment. *See Stern Electronics, Inc. v. Kaufman*, 669 F.2d 852 at 857 (2d Cir. 1982). Accordingly, there is no need to draw that "elusive" line "between the informing and the entertaining" referred to in *Winters v. People of New York*, 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948). *See also Heffron v. International Society for Krishna Consciousness*, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981); *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976).

Since video games do not implicate First Amendment problems, the validity of the City's regulatory scheme must be measured against the less rigorous standards of due process and equal protection under the Fourteenth Amendment. *See, e.g., Rinaldi v. Yeager*, 384 U.S. 305, 86 S.Ct. 1497, 16 L.Ed.2d 577 (1966). Municipalities have been accorded broad powers to control land use through zoning laws that are "rationally related to legitimate state concerns and [do] not deprive the owner of economically viable use of his property." *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61, 101 S.Ct. at 2182; *Village of Belle Terre v. Boraas*, 416 U.S. 1, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); *Euclid v. Ambler Realty Co.*, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

■ In this case, the plaintiff has failed to demonstrate that the regulatory scheme in issue is not a legitimate exercise of the City's police power. The City has produced documents and testimony, including the testimony of the District Manager of the local Community Board in which plaintiff's restaurant is located. The evidence demonstrates that the regulatory scheme is substantially related to the legitimate governmental objectives of protecting commercial development against congestion, promoting the most desirable use of land in accord with a well-considered plan, encouraging stability of commercial development, preserving the character of commercial districts and their peculiar suitability for particular uses, and protecting the health, safety, and welfare of the public at large. *See* New York City Administrative Code § 773–1.0; New York City Zoning Resolution §§ 31–00(g), 31–00(k).

Amusement arcades have attracted much media and community attention of late. The City has noted their proliferation and their deleterious effect upon the quality of life in the City's neighborhoods to justify regulating their operation. Amusement arcades attract large numbers of people for short periods of time. The City's regulatory provisions minimize the problems of noise and congestion and provide for the stable development of local communities, free from unnecessary noise and congestion.

Moreover, it bears emphasis that the City has not attempted to zone out an economic activity. Rather, it has engaged in a reasonable exercise of its police power by en-

acting legislation to regulate, and not totally prohibit, the operation of video games. In fact, any number of establishments including drug stores, restaurants, food stores, candy stores, meeting halls, billiard parlors, bowling alleys, hat repair shops, and theatres, are permitted to have up to four video games. In addition, special permits are available from the New York City Board of Standards and Appeals and the New York City Planning Commission permitting more than four such devices to be operated as amusement arcades in several commercial and manufacturing districts located throughout the City. New York City Zoning Resolution §§ 73–35 and 74–47. Finally, amusement arcades are permitted as of right in a C7 zoning district, and there is always the alternative available to the plaintiff and others of seeking a variance. Thus, it appears that the City's regulations bear a reasonable relationship to the public health, safety and general welfare.

■ Similarly, I find that plaintiff has failed to prove its equal protection claim. The City need only show that its legislative classifications are reasonably related to some legitimate governmental interest. *See City of New Orleans v. Dukes*, 427 U.S. 297, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976); *San Antonio School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973).

Plaintiff challenges two separate classifications implicit in the regulatory provisions: (1) that there is no basis for the City's distinction between business establishments offering fewer than five video games and those offering five or more video games, and (2) that there is no basis for the City's distinction between the use currently allowed in plaintiff's zoning district, which permits incidental musical entertainment by mechanical device or by not more than three persons playing piano, organ, guitar, accordian, or other stringed instrument, and the prohibited amusement arcade use.

I find that the City has advanced sufficient justifications to permit the conclusion that the challenged classification based on the number of video games is constitutional.

It represents the City Council's determination that a limit of four amusement devices represents the maximum permissible level of noise, congestion, and traffic for stable commercial neighborhoods. Such line-drawing must to some extent be arbitrary. But that does not make it unreasonable.

Similarly, the distinction drawn between the limited live entertainment permitted in plaintiff's zoning district and the operation of an amusement arcade prohibited in such district rests on a judgment that limited live entertainment is not as likely as an amusement arcade to attract a large number of people for a relatively short period of time. The slower turnover of an audience listening to live entertainment justifies the conclusion that such a use does not pose the same problems of noise and congestion as is posed by the operation of an amusement arcade. These legislative determinations are reasonable, and are made in furtherance of the protection of the public health, safety, and general welfare. It is not the function of a court to second-guess such legislative decisions.

*Balance of Hardships and Serious Questions Going to the Merits*

■ Whether video games are a form of expression protected by the First Amendment and whether the City's regulatory scheme is constitutional are serious questions. Given plaintiff's unlikelihood of success on the merits, however, I find that these questions are not sufficiently serious to warrant the grant of a preliminary injunction. Even if they were, because plaintiff is entitled at any time to open its restaurant with four video games, I find that the balance of hardships does not tip so decidedly toward plaintiff as to justify the preliminary injunction.

Accordingly, the plaintiff's motion is denied in all respects.

SO ORDERED.