200 F.Supp.2d 1126 (2002)
INTERACTIVE DIGITAL SOFTWARE ASSOCIATION, et al., Plaintiffs,
v.
ST. LOUIS COUNTY, MISSOURI, et al., Defendants.
No. 4:00CV2030 SNL.
United States District Court, E.D. Missouri, Eastern Division.
April 19, 2002.
*1127 *1128 Paul J. Puricelli, Stone and Leyton, Clayton, MO, Paul M. Smith, Deanne E. Maynard, David C. Belt, Jenner and Block, Washington, DC, for plaintiffs.
Michael A. Shuman, St. Louis County Counselor's Office, Clayton, MO, for defendants.

MEMORANDUM OPINION
LIMBAUGH, Senior District Judge.
This matter is before the Court on plaintiffs' motion for summary judgment (# 30). Plaintiffs brought the instant cause of action seeking a declaration that St. Louis County Ordinance No. 20,193 (Oct. 26, 2000) is unconstitutional pursuant to the First Amendment freedom of expression. The Ordinance in general makes it unlawful for someone to knowingly sell, rent, make available, or permit the "free play" of violent video games to minors without a parent or guardian's consent.

Summary Judgment Standard
Courts have repeatedly recognized that summary judgment is a harsh remedy that should be granted only when the moving party has established his right to judgment with such clarity as not to give rise to controversy. New England Mut. Life Ins. Co. v. Null, 554 F.2d 896, 901 (8th Cir.1977). However, summary judgment motions "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." Mt. Pleasant v. Associated Elec. Coop., Inc., 838 F.2d 268, 273 (8th Cir.1988).
Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all the information before the court demonstrates that "there is no genuine issue as to a material fact and the moving party is entitled to judgment as a matter of law." Poller v. Columbia Broad. Sys., Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962). The burden is on the moving party. Mt. Pleasant, 838 F.2d at 273. After the moving party discharges this burden, the nonmoving party must do more than show that there is some doubt as to the facts. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
In passing on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983). The court is required to resolve all conflicts of evidence in favor of the nonmoving party. Robert Johnson Grain Co. v. Chem. Interchange Co., 541 F.2d 207, 210 (8th Cir.1976).

*1129 Background

Plaintiffs are companies or associations of companies that create, publish, distribute, sell, rent, and/or make available to the public video games, including both computer and arcade games, and related software. They brought suit against St. Louis County, the County Executive of St. Louis County, and the Chief of Police of St. Louis County alleging that St. Louis County Ordinance No. 20,193 (Oct. 26, 2000), amending Chapter 602 of the St. Louis County Revised Ordinances by adding new sections 602.425 through 602.460, infringes upon constitutionally protected rights of free expression.
Prior to the passage of the Ordinance, the St. Louis County Council's Justice, Health and Welfare Committee held two hearings on the Ordinance on October 12, 2000, and October 19, 2000. There was testimony at the hearings by Dr. Craig Anderson, a psychology professor at Iowa State University, and Dr. Margaret Dolan, the Principal of McNair Elementary School in University City, Missouri. In his testimony, Dr. Anderson referred to studies which found that violent video games caused psychological damage to children. St. Louis County provided the Court a copy of the studies referred to by Dr. Anderson.[1] Representatives from the video game industry also testified before the Committee hearings. They explained the industry's rating system which is already in place, and how this voluntary self regulation is sufficient to address the issue without government regulation. Ms. Markels stated that the "control is in the hands of the viewers or players of the game."[2] Most of the industry's representatives stated that they are in support of the rating system, and their only problem with the Ordinance is that they believe it violates the First Amendment. A public forum was held on October 26, 2000, after which the County passed the Ordinance.
The Ordinance starts out with a six paragraph Preamble indicating why the ordinance was being enacted and what compelling interests the County has in enacting this legislation. The Preamble is as follows:
WHEREAS, exposure of children to graphic and lifelike violence contained in some video games has been correlated to violent behavior, and in fact the perpetrators of recent school shootings in Columbine, Colorado; Jonesboro, Arkansas; and Paducah, Kentucky were reported to be avid fans of such games; and
WHEREAS, numerous medical studies have cited a link between prolonged playing of violent video games and violent, antisocial and otherwise harmful behavioral patterns, and the American Medical Association suggests that exposure to violence, such as in these video games, causes children to imitate violent behavior, glorify violent heroes, become *1130 desensitized to violence and learn that violence is rewarded; and
WHEREAS, violence by and between children has become a severe threat to the physical and emotional health of children; and
WHEREAS, disruptive behavior by children who regularly watch or play violent video games has become a problem in schools and inhibits educators' ability to educate their students; and
WHEREAS, St. Louis County as a political subdivision of the State of Missouri has a compelling interest in protecting the physical and emotional health of children; and
WHEREAS, parents and guardians should have the power to control the types of games their children play and to control their exposure to violent and sexual materials.[3]
The Ordinance requires owners and managers of arcades to place video games which they know to be harmful to minors separate and apart from other video games, and shall designate such areas as "Restricted-17." § 602.435. The Ordinance makes it unlawful to knowingly sell or rent a video game which is harmful to a minor unless that minor is accompanied by a parent or guardian who consents to the purchase or sale. § 602.440.1. The Ordinance also makes it unlawful to knowingly admit a minor to a "Restricted-17" area, and to knowingly permit the free play of a video game which is harmful to minors on premises which video games are sold or rented. § 602.440.1-.2. "Harmful to minors" is defined in the Ordinance to mean a video game that "predominantly appeals to minors' morbid interest in violence", "is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, lacks serious literary, artistic, political or scientific value as a whole for minors, and contains ... graphic violence." § 602.425(c). The term "graphic violence" is defined in the Ordinance as the "visual depiction or representation of realistic serious injury to a human or human-like being where such serious injury includes amputation, decapitation, dismemberment, bloodshed, mutilation, maiming or disfiguration." § 602.425(d).
The Ordinance also contains a section regarding the "Presumption of Video Game Contents." It states that there shall be a "rebuttable presumption that video games rated `M' or `AO' by the Entertainment Software Review Board (ESRB) are harmful to minors." It goes on to state that video games rated "T," "EC," or "E" will be presumed not to contain graphic violence. § 620.450.1. In addition, there is a rebuttable presumption that arcade games rated "red" by the American Amusement Machine Association (AAMA), the Amusement and Music Operators Association (AMOA) and/or the International Association of Family Entertainment Centers (IAFEC) are harmful to minors, whereas those rated "yellow" or "green" do not contain graphic violence. § 620.450.2.
The ESRB rating system divides games into five categories based on the review of game content by trained raters. "EC" stands for "Early Childhood," and titles rated "EC" have content that may be suitable for children three years and older. Videos rated "E" for "Everyone" have content that may be suitable for persons age six and older, and may contain minimal violence, some comic mischief, or some crude language. Those videos rated "T" for "Teen" have content suitable for those *1131 thirteen years or older, and may contain violent content, mild or strong language, and/or suggestive themes. Titles rated "M" for "Mature" have content which may be suitable for those older than seventeen, and may include more intense violence or language than products in the Teen category, as well as, mature sexual themes. Those rated "AO" for "Adults Only" have contents suitable only for adults. These products may include graphic depictions of sex and/or violence.
The AAMA, AMOA and IALEI rate arcade games as "green," "yellow," and "red." Those marked with a "green" sticker are suitable for all ages. Those marked "yellow" contain either scenes of violence involving characters, engaged in combative activity that does not result in bloodshed, serious injury and/or death to characters; contains sexually suggestive references or material; or contains "commonly used four-letter words." Those marked "red," however, contain either scenes of strong violence which result in bloodshed, serious injury, and/or death to the depicted characters; contains graphic depictions of sexual behavior and/or the human body; or contains "strong four-letter expletives."
The video game industry and the technology employed in creating video games has changed drastically in the last few decades. There are a variety of different types of video games, including, but not limited to, adventure games, puzzle games, sports games, racing games, simulator games, hunting games, teenage and adult educational games, role-playing games, and shooting games. Plaintiffs provided the affidavit of Douglas Lowenstein, President of the Interactive Digital Software Association in support of its motion. Mr. Lowenstein attempted to explain the process of creating video games and included some examples, however, the Court did not get to view the final product of these games. St. Louis County did provide a videotape depicting four different games: "The Resident of Evil Creek", "Mortal Combat," "DOOM," and "Fear Effect."

Discussion
Plaintiffs challenge the Ordinance on the basis that it improperly restricts speech protected by the First Amendment. Their position is that video games are speech within the meaning of the First Amendment, and that the challenged provisions are content-based restrictions. They argue that strict scrutiny therefore applies, and that the Ordinance fails this standard because the County's stated interests are insufficient and the provisions are not narrowly tailored to promote those interests. Plaintiffs also argue that the challenged provisions of the Ordinance are unconstitutionally vague and overbroad.
St. Louis County defends the Ordinance on multiple grounds. First, they argue that video games do not contain sufficient expressive elements to put them within the protection of the First Amendment. Second, it asserts that assuming graphically violent video games contain some expressive elements to place purveying them within the First Amendment, they do so only as to adults, and not to minors, because the video games are obscene as to minors. Third, the County asserts that it has very compelling grounds to regulate the purveying to minors of graphically violent video games, and the Ordinance is the least restrictive means available. Fourth, the County urges the Court not to judge the purveying of graphically violent video games as a content-based restriction, but rather, urges the Court to observe that purveying the games is so far down the range of protected speech that, like sexually-explicit, non-obscene speech, the regulations should be treated as though contentneutral. *1132 Finally, the County argues that the Ordinance is anything but vague.
The Court must first decide whether video games even constitute speech so as to receive at least some protection from the First Amendment. If video games do fall within the category of protected speech, the Court must then determine what standard of scrutiny to apply to the regulations. The next step in the Court's analysis, is to apply the proper standard of scrutiny to the facts of this case. Finally, the Court must review whether the Ordinance is vague and overbroad.

I. Are Video Games a Form of Speech?
Although it is common to place the burden upon the government to justify impingements on First Amendment interests, it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies. Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984). In other words, there is no presumption that all conduct is expressive. Id. Therefore, plaintiffs bear the burden of showing that video games are expressive so as to trigger First Amendment protection.
In order to find speech, there must exist both an intent to convey a particularized message and a great likelihood that this message will be understood. Lewis v. Wilson, 89 F.Supp.2d 1082, 1087 (E.D.Mo. 2000); see also Spence v. State of Washington, 418 U.S. 405, 410-11, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974). Plaintiffs urge the Court to treat the "video game medium" as no less expressive than its "motion picture counterpart." In 1952, the Supreme Court held that expression by means of motion pictures is included within the free speech guaranty of the First Amendment. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 502, 72 S.Ct. 777, 781, 96 L.Ed. 1098 (1952). In Burstyn, the Court stated that it "cannot be doubted that motion pictures are a significant medium for the communication of ideas." Id. at 501, 72 S.Ct. at 780 (emphasis added). It also held that the "importance of motion pictures as an organ of public opinion is not lessened by the fact that they are designed to entertain as well as to inform." Id. The language used in Burstyn seems to indicate that there must be some element of information or some idea being communicated in order to receive First Amendment protection.
However, the Supreme Court has also held that it does not approve of the suggestion that the constitutional protection for a free press applies only to the exposition of ideas. Winters v. People of State of N.Y., 333 U.S. 507, 510, 68 S.Ct. 665, 667, 92 L.Ed. 840 (1948) (holding that "indecent" magazines are as much entitled to the protection of free speech as the best of literature). Winters goes on to state that the "line between the informing and the entertaining is too elusive for the protection of that" right. "What is one man's amusement, teaches another's doctrine." Id. Interestingly, the Burstyn opinion quotes this portion of the Winters opinion.
The Court does find a distinguishing characteristic of the subject matter at issue in Burstyn and Winters. Literature had long been accepted as speech deserving the protection of the First Amendment. The Court in Winters was presented with the issue of whether "literature" which appeared to have no value to society, was still protected under the First Amendment like other forms of literature. See Id. In contrast, the Court in Burstyn was presented with the issue of whether motion pictures as an entirely new medium deserved the protection of the First Amendment. It appears to the Court if an entirely new "medium" is being given First *1133 Amendment protection, there does need to be at least some type of communication of ideas in that medium. It has to be designed to express or inform, and there has to be a likelihood that others will understand that there has been some type of expression.
In the early 1980s, courts began facing the issue of whether video games were forms of expression entitled to First Amendment protection. Courts almost unanimously held that video games lacked the expressive element necessary to trigger the First Amendment.[4] A federal district court in New York was the first to address the issue. See America's Best Family Showplace Corp. v. City of N.Y., Dep't of Buildings, 536 F.Supp. 170 (E.D.N.Y.1982). The court in America's Best Family reviewed the holding in Burstyn and found that "in no sense can it be said that video games are meant to inform. Rather, a video game, like a pinball game, a game of chess, or a game of baseball, is pure entertainment with no informational element." Id. at 173-74. The court determined that some of the games "talk" to the participant, play music, or have written instructions, but that alone does not provide the missing element of "information." Id. at 174. The court went on to hold that video games "contain so little in the way of particularized form of expression" that they cannot be "fairly characterized as a form of speech protected by the First Amendment." Id.
In Caswell, Massachusetts's highest court reviewed the issue in detail. Caswell v. Licensing Comm'n for Brockton, 387 Mass. 864, 444 N.E.2d 922, 925-27 (1983). In Caswell, the plaintiff argued that video games were analogous to motion pictures in that every video game represented the author's expression of a particular idea or fantasy in a tangible form, and that the programs had a plot or theme. Id. at 926. However, the court held that any communication or expression of ideas that occurs during the playing of a video game is purely inconsequential. Id. at 927. The court went on to hold that the plaintiff had succeeded in establishing only that video games are more technologically advanced games than pinball or chess, and that technological advancement alone does not impart First Amendment status to what is an otherwise unprotected game. Id.
Plaintiffs rely heavily on the recent Seventh Circuit opinion which affirmed a district court opinion holding that some video games are "speech" within the meaning of the First Amendment. American Amusement Mach. Ass'n v. Kendrick, 244 F.3d 572 (7th Cir.2001), aff'g 115 F.Supp.2d 943 (S.D.Ind.2000). The Seventh Circuit did not address the issue directly, and therefore, the Court must look to the district court opinion to determine specifically the Seventh Circuit's position on the issue. The district court held that based on the evidence in the record, "at least some contemporary video games include protected forms of expression." 115 F.Supp.2d at *1134 954. However, the court also stated that it had "no difficulty determining that any speech elements of ... several of the [] games described in the record are relatively inconsequentialperhaps even so inconsequential as to remove the game from the protection of the First Amendment." Id. However, the court went on to repeat that at least some games are protected by the First Amendment.
This Court has difficulty accepting that some video games do contain expression while others do not, and it finds that this is a dangerous path to follow. The First Amendment does not allow us to review books, magazines, motion pictures, or music and decide that some of them are speech and some of them are not. It appears to the Court that either a "medium" provides sufficient elements of communication and expressiveness to fall within the scope of the First Amendment, or it does not. The court in American Amusement only viewed action-adventure games, fighting games, and shooting games, and determined that even some of these might not fall within First Amendment protection. It can be assumed that the court would have similar reservations with puzzle games, sports games, and driving games.
This Court reviewed four different video games, and found no conveyance of ideas, expression, or anything else that could possibly amount to speech. The Court finds that video games have more in common with board games and sports than they do with motion pictures. A few courts have looked at whether "Bingo" is speech and protected under the First Amendment. In this instance, the Seventh Circuit held that "Bingo" does not convey ideas, nor does it contain "expression", and therefore, it is not protected by the First Amendment. There to Care, Inc. v. Commissioner of the Ind. Dep't of Revenue, 19 F.3d 1165, 1167 (7th Cir.1994). The Seventh Circuit also implied that a game of blackjack is not expressive. Id. Another court has held that a Bingo game is wholly devoid of the requisite communicative and informative elements necessary for First Amendment protection. Allendale Leasing, Inc. v. Stone, 614 F.Supp. 1440, 1454 (D.R.I.1985). The court went on to hold that Bingo may involve interaction and communication between runners and participants, but any such communication is "singularly in furtherance of the game; it is totally divorced from a purpose of expressing ideas, impressions, feelings, or information unrelated to the game itself." Id.
It might seem odd that the Court is comparing video games to games of Bingo, however, most of these simple games can and have been created in video form. The Court has trouble seeing how an ordinary game with no First Amendment protection, can suddenly become expressive when technology is used to present it in "video" form. For instance, the game of baseball is not a form of expression entitled to free speech protection. It is often times surrounded by speech and expressive ideas music between innings, fans carrying signs with expressive messageshowever, these expressive elements do not transform the game of baseball into "speech." Rather it remains, just what it isa game. Nor does the Court think there is some magical transformation when this game of baseball appears in video form. The objectives are still the sameto score runsand the only difference is a player pushes a button or swings a "computer bat," rather than swinging a wooden bat. Just like Bingo, the Court fails to see how video games express ideas, impressions, feelings, or information unrelated to the game itself.
The Court also finds that "violent" video games do not have any more expressive elements than other video games just because *1135 they are deemed to be violent. In other words, "violence" does not automatically create expression. Just as a baseball game is not a form of expression, neither is a hockey game. If within that hockey game, two players get in a fight, or someone gets sliced with a hockey stick and blood flies, the game does not suddenly become a form of expression. Another applicable analogy is boxing, where the main objective is to punch and knock out the opponent. However, boxing is still just a sport, not speech. In the same light, video games do not become a form of expression just because they contain violence.
Plaintiffs provided the Court with "scripts" from various video games. The Court admits that these "scripts" were creative and very detailed. However, almost every new creation and/or invention, starts as a "creative concept in the minds of the [] developers, who brainstorm, collaborate, and sketch scripts." See Memorandum in Support of Plaintiffs' Motion, at 3. Every product put on the market came from a creative concept. Most of the developers had to write down their ideas, and had to sketch pictures in order to convey their ideas to others working on the project. However, this "background" expression does not make every automobile, gadget, or machine created, a form of expression. The Supreme Court has held that it is "possible to find some kernel of expression in almost every activity ... but such a kernel is not sufficient to bring the activity within the protection of the First Amendment." City of Dallas v. Stanglin, 490 U.S. 19, 25, 109 S.Ct. 1591, 1595, 104 L.Ed.2d 18 (1989).
Plaintiffs claim that the final product contains "extensive plot and character development." However, plaintiffs did not show the Court the final product, the video game, and the issue in this cause of action is whether plaintiffs' video games are a form of expression, not whether plaintiffs' "scripts" are a form of expression. The Court must look at the video games in their context, in the environment in which they are presented. See Spence v. State of Washington, 418 U.S. 405, 410, 94 S.Ct. 2727, 2730, 41 L.Ed.2d 842 (1974) (the context in which a symbol is used for purposes of expression is important, for the context may give meaning to the symbol). The only video games given to the Court were those presented by defendants, and the Court simply did not find the "extensive plot and character development" referred to by the plaintiffs in the games it viewed. For all of these reasons, the Court finds that plaintiffs failed to meet their burden of showing that video games are a protected form of speech under the First Amendment.

II. Standard of Scrutiny if Video Games Are Speech
Even if plaintiffs could establish that the video games are a form of expression, their constitutional argument still fails in that the Constitution permits the County to impose some restrictions on speech in certain circumstances which exist in the instant cause of action. Plaintiffs argue that the Ordinance regulates video games based on their content, and therefore, the regulations are subject to strict scrutiny. Defendants on the other hand, urge the Court to apply a lower degree of scrutiny. Both parties agree that generally content-based regulations of expression must survive strict scrutiny unless the expression fits within one of the narrowly limited classes of speech that lack full First Amendment protection. The County attempts to argue that video games fall within this limited category because they are obscene as to minors. The County urges the Court to treat video games as sexually-explicit, non-obscene speech, and *1136 therefore apply a lesser standard of scrutiny.
The Eighth Circuit has directly addressed this issue, and has specifically rejected the County's position. See Video Software Dealers Ass'n v. Webster, 968 F.2d 684 (8th Cir.1992). The Eighth Circuit noted that expression which is not obscene for adults may be obscene for children if the expression bears certain indicia of obscenity when examined from a minor's point of view. Id. at 688. The Eighth Circuit went on to hold that obscenity encompasses only expression that depicts or describes sexual conduct, and materials that contain violence but not depictions or descriptions of sexual conduct cannot be obscene. Id.
The Court finds that, assuming the video games are a form of expression protected by the First Amendment, the regulations in the Ordinance are content-based. Video games that show graphic violence are treated differently than other video games, and therefore the regulations are based on the content of the games. In Video Software, the Eighth Circuit reviewed a Missouri statute which prohibited the rental or sale of violent movie videos to minors, and held that the government needed to justify its content-based restriction by showing the statute was narrowly drawn to advance a compelling governmental interest. Id. at 689. The Court finds that the standard used in Video Software would be the same in the instant cause of action. Therefore, the Court finds that strict scrutiny would apply if the Ordinance did in fact regulate speech. The government would have to show a compelling interest in regulating these types of games and show that the regulations are narrowly tailored to advance that interest.

III. Applying Strict Scrutiny to the Ordinance if it Does Restrict Speech
The Ordinance survives strict scrutiny if the regulations on video games serve a compelling governmental interest, and if those restrictions are carefully tailored to achieve the stated interests. Video Software, 968 F.2d at 689. The County has two stated interests: 1) to protect the physical and emotional health of the children in St. Louis County, and 2) to assist parents to be the guardians of their children's well-being.
The well-being of its children is a subject within the County's constitutional power to regulate. Ginsberg v. State of N.Y., 390 U.S. 629, 639, 88 S.Ct. 1274, 1280, 20 L.Ed.2d 195 (1968). "Constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society." Id. It is essential that the custody, care and nurture of the child reside first in the parents, and parents who have this "primary responsibility for children's well-being are entitled to the support of laws designed to aid discharge of that responsibility." Id. Government also has an independent interest in the well-being of its youth. Id. at 640, 88 S.Ct. at 1281. The knowledge that parental control cannot always be provided and "society's transcendent interest in protecting the welfare of children justify reasonable regulation of the sale of material to them." Id. Accordingly, the County's stated interests are legitimate in the abstract. The remaining issue is whether the County can conclude, as it has, that exposure to these video games are harmful to the children's well-being.
The County relied on testimony from Dr. Anderson and Dr. Dolan, as well as the studies referred to by these witnesses, in concluding that video games are physically *1137 and emotionally harmful to children. Dr. Anderson testified regarding a study in which he and Dr. Brad Bushman had just completed concerning the playing of violent video games. He told the Council that they found that playing violent video games for as short of a time as 10 to 15 minutes does in fact lead to aggressive behavior in the immediate situation. He discussed these effects and how aggressive behavior occurs. He also found that pro-social behavior decreases after exposure to violent video games. He also indicated that children have more aggressive thoughts and frequently more aggressive behavior after playing violent video games.
Dr. Anderson testified that there are a number of studies on the effect of watching violent movies and violent TV shows. The conclusions of these studies are that there is a causal connection between viewing violent movies and TV programs and violent acts. Dr. Anderson indicated that there is a distinction between the passive viewing of violent movies and TV programs and these interactive video games. He explained that with video games players are acting out acts of violence and depending on the skill of the player the acts of violence per minute increases. Players are told to identify with the aggressor and the player controls the action of the character. In addition, unlike TV or movies, video games are addictive in nature. Dr. Anderson found in his study that violent video games provide a complete learning environment for aggression, with simultaneous exposure to modeling, reinforcement, and rehearsal of behaviors.
At the hearing, Dr. Anderson referred to a Lt. Colonel Dave Grossman[5] who has written books on the subject of violent video games and his publications suggest that these violent video games are killing simulators. According to Grossman, the United States Army and Marines use the same techniques that violent video games depend on to train recruits to kill. The Army actually uses a video game "Doom"[6]to train soldiers. Dr. Anderson indicated that with movies and TV children may learn violence as a response but with video games they learn how to carry out these acts.
Plaintiffs claim that the above evidence is not enough for the County to meet its burden of showing that violent video games are physically and psychologically harmful to minors. Defendants claim that a scientific demonstration of psychological harm is not required in order to establish the constitutionality of measures protecting minors from indecent speech. Defendants go on to state that the County Council is entitled to believe that graphically violent video games lead to the psychological harm of minors. Plaintiffs respond by arguing that defendants' position is only relevant in the context of a rational-basis standard such as those cases dealing with obscene speech. The Court finds that the County Council can rely on society's accepted view that violence is harmful to children, especially when plaintiffs have admitted that intense violence may not be suitable for those younger than seventeen years of age.
Society in general believes that continued exposure to violence can be harmful to children. The motion picture industry accepts this theory which is why extremely violent movies are rated-R. Children under seventeen are prohibited from seeing rated-R movies at the theaters unless accompanied by an adult, and movie rental *1138 stores will not rent rated-R movies to minors without parental consent. Even more important, are plaintiffs' own admissions in the rating system in which they employ. The industry suggests that videos rated "M" are "suitable for persons ages 17 and older" because they "may include more intense violence or language." If these more violent video games are not harmful to children under seventeen, the industry would never make that distinction. There is a reason why a game may be suitable for persons age seventeen and older, but might not be suitable for those under seventeen years of age. Video games rated "AO" may include "graphic depictions of violence." Plaintiffs admit in their rating system that "AO" games are "not intended to be sold or rented to persons under the age of 18."[7] For plaintiffs to now argue that violent video games are not harmful to minors is simply incredulous. Therefore, the Court finds that the County has compelling interests in regulating the distribution of violent video games to minors.
The Court also finds that the statute is narrowly drawn to regulate only that expression which is necessary to address the government's compelling interests. In coming to this conclusion, the Court has looked at the right of the video game "creators" to speak, the right of minors to receive that speech, the right of parents to decide what is suitable for their children, and the right of the County to protect the welfare of its children. The Ordinance does not prohibit video game "creators" from making any video games, however, the Ordinance does limit the number of people video game makers can reach with their video game makers can reach with their video games. Non-violent video games can be purchased and played by everyone. According to plaintiffs, that is the majority of the games. Violent video games can be purchased and played by all those over seventeen, which according to plaintiffs are the majority of the purchasers. Violent video games can also be purchased and played by those under the age of seventeen if the parents have given their consent. So in practice, the video game industry is only restricted in conveying their violent "message" to those under seventeen years of age whose parents do not want their children viewing and/or playing that particular type of game.
The Ordinance makes it as easy as possible for parents to give their consent. The parents can physically be present to give their permission. They can also give pre-approval of the purchase or rental if the vendor has established an electronic or manual system for pre-approval. At the arcades, parents can appear with the minor and give permission for the minor to be stamped or otherwise marked to signify that the minor has permission on that date, or the parent can give pre-approval of the minor's presence in Restricted-17 areas if the arcade has established an electronic or manual system for pre-approval. The Court finds that the regulations in the Ordinance are narrowly drawn to only serve those stated governmental interests.

IV. Whether Ordinance is Vague
Plaintiffs argue as a second, and independent basis for granting their motion for summary judgment, that the Ordinance's terms are impermissibly vague, and therefore, are likely to restrict a far broader range of video games than even the County would claim it is seeking to regulate. In addition, plaintiffs argue that the vagueness of terms, and their chilling *1139 effect on speech are compounded by the Ordinance's delegation to the ESRB and the arcade industry the issue of whether a game is "harmful to minors."
Plaintiffs claim that the following terms in the Ordinance are vague: "Minors' Morbid Interest in Violence," "Graphic Violence," and "Patently Offensive." To survive a vagueness challenge, a statute must "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited" and "provide explicit standards for those who apply the statute." Video Software, 968 F.2d at 689. A stringent vagueness test applies to a law that interferes with the right of free speech.[8]Id. at 689-90. However, the Supreme Court has consistently held that lack of precision is not itself offensive to the requirements of due process. The Constitution does not require impossible standards, all that is required is that the language conveys a sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. Miller v. California, 413 U.S. 15, 27 n. 10, 93 S.Ct. 2607, 2617, 37 L.Ed.2d 419 (1973).
The Supreme Court has recognized the impossibility of defining the precise line between permissible uncertainty in statutes and unconstitutional vagueness. See Winters, 333 U.S. at 518, 68 S.Ct. at 671. However, the Court held that the entire text of the statute or the subjects dealt with may furnish an adequate standard. Id. Therefore, the Court turns to the entire Ordinance, rather than choosing isolated phrases from the Ordinance.
The Ordinance states that it is unlawful to knowingly sell or rent a video game which is "harmful to minors" to a minor without a parent's consent. A "minor" is defined as any person under the age of 17. "Harmful to minors" is defined as a video game that "predominantly appeals to minors' morbid interest in violence or minors' prurient interest in sex, is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for minors, lacks serious literary, artistic, political or scientific value as a whole for minors, and contains either graphic violence or strong sexual content." The Ordinance further defines "graphic violence" as "visual depiction or representation of realistic serious injury to a human or human-like being where such serious injury includes amputation, decapitation, dismemberment, bloodshed, mutilation, maiming or disfiguration."
The language of the Ordinance is much more precise than the statute struck down by the Eighth Circuit in Video Software. In Video Software, the Eighth Circuit pointed out that the statute contained no definition of "violence" which specified the violent acts to which the statute's test applied, and in addition, no explanation of purpose accompanied the statute.[9] The Eighth Circuit continuously criticized the statute for failing to define "violence" and determined that the statute was unconstitutionally vague for failing to define "violence" in the statute. See Id. at 687-88, 690. The Eighth Circuit noted that the statute adopted Miller's[10] obscenity test, but simply substituted the word "violence" *1140 for the term "sexual conduct." The court then noted that Miller requires a specific definition of "sexual conduct" in either the statute or as construed by state courts, and the statute at issue in Video Software failed to specifically define "violence." Id. at 690.
In contrast, the Ordinance at issue in this cause of action does specifically define "graphic violence." However, plaintiffs claim that the definition raises more questions than it answers. They specifically criticize the word "realistic" used in the definition of "graphic violence." Ironically, these same plaintiffs use the description "realistic" on the back of video game packages to describe the content of the video games. The content descriptors which can appear on the back of a video game package include "Mild Realistic Violence," "Realistic Violence," "Realistic Blood and Gore," and "Realistic Blood." In addition, plaintiffs question the terms "human-like," "serious injury," and "bloodshed" as used in the Ordinance. However, the arcade industry in its rating system labels games "red" if they contain "scenes of strong violence involving human-like characters which result in bloodshed, serious injury and/or death to depicted character(s)."
The Supreme Court has stated that "Clearer and more precise language might have been framed by Congress to express what it meant ... But none occurs to us, nor has any better language been suggested, effectively to carry out what appears to have been the Congressional purpose." U.S. v. Petrillo, 332 U.S. 1, 7, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877 (1947). The Supreme Court went on to state that the argument appeared to be that "no statutory language could meet the problem Congress had in mind." Id. The Court then held that the Constitution "presents no such insuperable obstacle to legislation." Id. at 7, 67 S.Ct. at 1542.
The instant cause of action has similar problems. Plaintiffs criticize the County for not being more specific in their language defining "graphic violence." They complain about the terms "realistic," "human-like," "serious injury," and "bloodshed." However, plaintiffs use the same descriptions to describe the content of their video games. The Court cannot require the County to use more precise language, when the ones who create, publish, distribute, sell, and rent these video games find it impossible to give more precise language. In addition, the Court finds it incredulous that plaintiffs claim they have no idea what "realistic," "human-like," "serious injury," and "bloodshed" mean as applied to video games when they use these same descriptive words to inform parents and the public of the content of video games. When measured by common understanding and practices, especially by the industry, the language challenged sufficiently conveys a definite warning as to the proscribed conduct. See Petrillo, 332 U.S. at 8, 67 S.Ct. at 1542.
In addition, plaintiffs criticize the Ordinance's "rebuttable presumption" that games rated "M" or "AO" by the ESRB, or "red" by the arcade rating systems are "harmful to children." Plaintiffs claim that the Ordinance effectively delegates to the ESRB and the arcade industry the issue of whether a game is "harmful to minors." The Court disagrees. The Ordinance does contain a definition of "harmful to minors" which is separate from the industry's rating systems, and the ESRB and arcade industry ratings only create a "rebuttable presumption," which works both ways, for and against future defendants. Those cases which plaintiffs cite involve ordinances which delegated broad discretion to judges, juries, and police officers, not to those affected by the ordinance.
*1141 In the hearings before the County Council, industry members, those representing plaintiffs, repeatedly told the Council that they wanted to be self regulated. Incorporating their own rating system into the Ordinance, allows them to take an active part in the regulation. The Ordinance is simply forming a rebuttable presumption that those videos which the industry thinks may only be "suitable for persons ages 17 and older" are harmful to those under seventeen years of age. In addition, the Ordinance's acknowledgment of the rating systems, gives the industry members a better understanding of the conduct prohibited by the statute. Accordingly, plaintiffs' argument that the Ordinance is vague and does not convey a sufficiently definite warning as to the proscribed conduct, fails.

Conclusion
Plaintiffs bear the burden of showing that video games are expressive so as to trigger First Amendment protection. The Court finds that plaintiffs failed to meet this burden of showing that video games are a protected form of speech under the First Amendment. However, even if plaintiffs could establish that video games are a form of expression, their constitutional argument still fails. If the regulation of video games does trigger First Amendment protection, the Court finds that strict scrutiny would apply in analyzing the Ordinance, and that the County would have to show a compelling interest in regulating these types of games and show that the regulations are narrowly tailored to advance that interest. The County has two compelling interests: 1) to protect the physical and emotional health of the children in St. Louis County, and 2) to assist parents to be the guardians of their children's well-being. In addition, the Court finds that the Ordinance is narrowly drawn to regulate only that expression which is necessary to address the County's compelling interests. Finally, the Court finds that the Ordinance is not vague and that it conveys a sufficiently definite warning as to the proscribed conduct.
Accordingly, the Court finds, based on the evidence in the record, that plaintiffs failed to show that St. Louis County Ordinance No. 20,193 (Oct. 26, 2000), amending Chapter 602 of the St. Louis County Revised Ordinances by adding new sections 602.425 through 602.460, is unconstitutional and that they are entitled to judgment as a matter of law. Therefore, plaintiffs' summary judgment motion is denied.
NOTES
[1] Plaintiffs argue that the Court should not consider the articles because they are inadmissible hearsay evidence. However, one of the articles is the publication of Dr. Anderson's study, and Dr. Anderson could testify in court regarding this study because he has personal knowledge in conducting it. In addition, Dr. Anderson used this study, as well as the evidence in the second article, as a basis for his opinion that video games can cause psychological damage to children. If called upon to testify in a trial as an expert, Dr. Anderson would be allowed to give the basis for his opinions, including going into detail about these studies and the publications in this area of expertise. In addition, it is obvious from the language used in the Ordinance Preamble that the County Council considered these articles when passing the Ordinance.
[2] This was taken from the Report of the Justice, Health and Welfare, St. Louis County Council regarding the hearings on October 12, 2000 and October 19, 2000, provided to the Court by defendants.
[3] Plaintiffs do not challenge the provisions of the Ordinance insofar as they are applied solely to sexual content. Therefore, the Court will not address those portions of the Ordinance.
[4] See Rothner v. City of Chicago, 725 F.Supp. 945, 948-49 (N.D.Ill.1989); Malden Amusement Co., Inc. v. City of Malden, 582 F.Supp. 297, 299 (D.Mass.1983); America's Best Family Showplace Corp. v. City of N.Y., Dep't of Buildings, 536 F.Supp. 170 (E.D.N.Y.1982); Kaye v. Planning and Zoning Comm'n, 39 Conn.Supp. 170, 472 A.2d 809 (1983); Caswell v. Licensing Comm'n for Brockton, 387 Mass. 864, 444 N.E.2d 922, 925-27 (1983); City of St. Louis v. Kiely, 652 S.W.2d 694, 697 (Mo.Ct.App.1983); Tommy and Tina Inc. v. Department of Consumer Affairs of the City of N.Y., 117 Misc.2d 415, 459 N.Y.S.2d 220, 226-27 (N.Y.Sup.Ct.1983). It should be noted that Rothner was affirmed by the Seventh Circuit, but the Court of Appeals specifically chose not to address this issue, determining that it could affirm the district court without reaching the issue. 929 F.2d 297, 302-03 (7th Cir.1991).
[5] Lt. Colonel Grossman is a psychologist and professor, who for more than twenty-five years researched the psychology of killing for the Army.
[6] "Doom" was one of the video games presented to the Court by defendants.
[7] In addition, Mr. Gershman, representative of the St. Louis Coin Operators Association, testified at the hearing regarding the rating system employed by it and he explained that those marked with red stickers were available to anyone over the age of seventeen, again making an age distinction.
[8] The Court will analyze the vagueness issue as if video games are free speech despite the Court's determination that they are not in Sec. I of this opinion. The Court would like to note that the Ordinance easily passes a less stringent test applicable to normal, non-speech restrictions.
[9] The Preamble to the Ordinance at issue in this cause of action is printed in full in the Background Section of this opinion. The Preamble gives an explanation of the purpose of the Ordinance.
[10] The Eighth Circuit was referring to the test defining "obscenity" in Roth v. U.S., 354 U.S. 476, 77 S.Ct. 1304, 1 L.Ed.2d 1498 (1957).